# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

MAURICE GERALD STESKAL,
Defendant and Appellant.

S122611

Orange County Superior Court
99ZF0023

April 29, 2021

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Groban, and Jenkins concurred.

PEOPLE v. STESKAL

S122611


Opinion of the Court by Kruger, J.


A jury convicted defendant Maurice Gerald Steskal of the first degree murder of Orange County Deputy Sheriff Bradley J. Riches. (Pen. Code, § 187.) The jury found true a special circumstance allegation that Steskal intentionally killed a peace officer engaged in the performance of his duties (*id.*, § 190.2, subd. (a)(7)), as well as an allegation that Steskal personally used a firearm in the commission of the offense (*id.*, former §§ 12022.5, subd. (a), 12022.53, subd. (d)). The trial court declared a mistrial when the jury was unable to reach a penalty verdict. After a penalty retrial, the jury returned a verdict of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).) We affirm the judgment.

## I. BACKGROUND

### A. Guilt Phase

#### 1. *Prosecution evidence*

On the night of June 11, 1999, Steskal was seen near the residence of his wife, Nannette Steskal, from whom he was then separated.[1] Close to midnight, a neighbor of Nannette's heard a commotion in their apartment complex. The neighbor then saw Steskal outside smashing a piece of furniture against the

---

[1] Given Nannette and Maurice Steskal's identical surnames, we will refer to Nannette by her first name for clarity. No disrespect is intended.

1

wall and heard him slam a gate while cursing at the world and screaming that he hated everyone. The neighbor heard a woman trying to calm him. Steskal responded, "Fuck that, I have guns, I have ammunition."

Shortly after midnight, Steskal went into a 7-Eleven convenience store carrying a semiautomatic rifle. As he purchased cigarettes, he asked the clerk if she was afraid of his gun and told her it was to protect himself from the "fucking law." An Orange County Sheriff's Department (OCSD) deputy, Bradley Riches, drove by the 7-Eleven in his patrol car while Steskal was inside. Apparently seeing Steskal's rifle through the glass front of the store, Deputy Riches doubled back while issuing a radio alert for other deputies to stand by. As Steskal completed his purchase, Deputy Riches pulled into the 7-Eleven parking lot with his overhead lights flashing. The clerk watched as Steskal walked out of the store and immediately began firing his rifle. Steskal shot Deputy Riches at close range, firing 30 rounds in total, then returned to his car and drove away. When first responders arrived on the scene, they found Deputy Riches still seated in his car. It appeared he had unsnapped his holster but had been unable to pull his revolver before succumbing to his wounds.

A criminalist testified about the bullet casings and other evidence found at the crime scene, identified photographs showing damage to the patrol car, and explained her efforts to determine the trajectory of the shots fired. The criminalist identified a photograph of Deputy Riches's body at the hospital and a pathologist described Deputy Riches's numerous injuries. An OCSD sergeant testified that the 7-Eleven where Deputy Riches had been killed was one of the few convenience stores open 24 hours a day and was therefore a regular meeting place

for patrol deputies.

OCSD deputies apprehended Steskal a few hours after the crime as he and Nannette drove away from her apartment. In Steskal's car, deputies found over one hundred rounds of ammunition and a disassembled rifle later identified as the weapon used in the shooting. A blood screen found no drugs or alcohol in Steskal's system.

Steskal had other encounters with law enforcement in the months before Deputy Riches was killed. Approximately two and one-half months before the crime, a different OCSD deputy, Andre Spencer, stopped Steskal for a traffic violation and arrested him for possession of a small amount of marijuana and resisting an officer in the performance of official duties. During the stop, Deputy Spencer saw Steskal pound his hands on his steering wheel and became alarmed when Steskal exited his vehicle. Deputy Spencer drew his gun on Steskal, summoned additional deputies, and searched Steskal's pants and shoes for contraband. Deputy Spencer stopped Steskal for another traffic violation one month later. Deputy Spencer reminded Steskal to take care of his prior tickets and ended the stop without incident.

### 2. *Defense evidence*

Steskal did not deny shooting Deputy Riches, but presented evidence intended to show that he was acting under a delusional fear when it occurred. Steskal's sister and a variety of acquaintances testified that Steskal had been paranoid for many years and was particularly occupied by thoughts that law enforcement and government actors were following him and wished him harm. He had long kept an assault rifle that he slept with and carried with him everywhere. For most of his

adult life, Steskal lived apart from others — on the roof of a shop where he worked, in a van, and in a small concrete bunker on an abandoned mining site owned by his brother-in-law. Even when living far from others, Steskal believed bad actors were seeking him out: He worked on an escape route from his bunker, wearing down a pickaxe as he tried to make a tunnel through granite, and ran through the woods looking for pursuers with blackberry juice rubbed on his skin to provide camouflage. In the months before the crime, Steskal spent much of his time living in a remote mountain camp. Although he was separated from his wife, he sometimes stayed with her. He believed her apartment was wiretapped and felt he was being monitored through her television. He was depressed and often talked about suicide.

The lay witnesses observed that Steskal's mental health deteriorated significantly after the two traffic stops conducted by Deputy Spencer: Steskal became even more consumed with thoughts that he was under surveillance and in danger; believed OCSD deputies were going to kill him; and made serious attempts at suicide. He also grew more distraught about his failed marriage.

Four defense experts detailed Steskal's family dysfunction, physical abuse from his parents and siblings, difficulties in school, drug use, and history of suicidal thinking, suspiciousness, and peculiar ideas. The defense psychiatrist, Dr. Roderick Pettis, concluded that Steskal suffered from chronic paranoia that had progressed to full-blown psychosis after the traffic stops by Deputy Spencer — Steskal went from feeling the police were following him to fearing they would kill him. Dr. Pettis testified that at the time of the crime, Steskal was in a psychotic state and suffering from a delusional

disorder.

## B. Penalty Phase

The prosecution presented evidence of an incident that occurred 19 years before the crime, in which Steskal intentionally drove his motorcycle at high speed toward a police officer who had stopped him for speeding. Steskal nearly hit the officer. Deputy Riches's parents, Bruce and Meriel Riches, testified about their son's hard work, his desire to help others, and how they responded to his death.

The defense presented witnesses who described Steskal's kindness to others and an additional expert who summarized Steskal's background and testified that Steskal suffered from a delusional disorder, chronic depression, and schizotypal personality disorder, a personality disorder on a continuum with schizophrenia.

The trial court declared a mistrial after the jury deadlocked 11 to one in favor of life without the possibility of parole.

## C. Penalty Retrial

During the penalty retrial, the prosecution introduced much of the same evidence that was presented at the guilt phase. Witnesses described Steskal's behavior just before the crime, at the 7-Eleven, and during his arrest. The prosecution presented new evidence to show that Steskal attempted to destroy the T-shirt he was wearing during the crime, as well as evidence that Steskal shaved his moustache immediately after the shooting. In addition to the first responders and criminalists from the sheriff's department who had testified in the guilt phase, a paramedic testified for the first time about his efforts to save Deputy Riches's life and the moment of his death. The

pathologist described Deputy Riches's injuries with the assistance of a life-sized mannequin that was pierced with rods to show the bullet wounds.

The prosecution again introduced as aggravating evidence Steskal's behavior during the motorcycle stop, as well as new evidence of his attempted escape from jail before the penalty retrial. The prosecution presented evidence that Steskal had accumulated contraband metal clippers and scraped away a portion of his cell wall that abutted a ventilation system leading to the roof of the jail. Steskal had also hidden strips of bedsheets in his mattress that were long enough to lower him from the roof of the jail to the street.

The prosecution again introduced victim impact evidence from Deputy Riches's parents, as well as testimony from Deputy Riches's best friend and three colleagues from the sheriff's department who described his positive outlook and loyalty. The witnesses conveyed the loss they and their families experienced when Deputy Riches was murdered.

The defense also largely mirrored the guilt phase, with identical evidence depicting Steskal's background, his deteriorating mental health, and expert opinions regarding his condition. Steskal's brother and sister testified in greater detail about the physical and emotional abuse Steskal experienced in childhood and his suicide attempt at age 13. Acquaintances described his kindness; Steskal's niece described him as a father figure who provided regular encouragement and support through correspondence from jail.

On rebuttal, the prosecution presented testimony from three officers who interacted with Steskal while he was in jail awaiting the penalty retrial and who found no indication he

experienced mental health problems. The prosecution also introduced evidence of an incident that took place 11 years before the crime, in which Steskal was driving erratically and dropping clear plastic bags out of his vehicle before an OCSD deputy stopped him. During the stop, Steskal appeared to be under the influence of drugs or alcohol, would not provide his name, and repeatedly yelled that he wanted the deputy to shoot him.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. *Refusal to instruct the jury on voluntary manslaughter*

Steskal raises numerous claims of error. He first claims the trial court erred by denying his request to instruct the jury on voluntary manslaughter based on a theory of imperfect self-defense — that is, a theory that Steskal actually, though unreasonably, believed his life was in danger when he shot Deputy Riches. The trial court denied the request because the evidence did not support giving the instruction. We find no error in the court's ruling.

#### a. *Background*

At trial, Steskal called several witnesses who described Steskal's attitudes toward law enforcement and their causes, including, primarily, Steskal's experiences during the two traffic stops conducted by Deputy Spencer. A retired Los Angeles Police Department tactics officer testified that Deputy Spencer's arrest of Steskal after a traffic stop some months before the crime was highly unprofessional. During the stop, Deputy Spencer drew his gun on Steskal, cursed at and disparaged him, called additional officers to the scene, unfastened Steskal's

pants, and searched inside his underwear. Deputies wrestled Steskal to the ground when he began to protest the treatment. The second stop by Deputy Spencer occurred when Steskal allegedly failed to signal a turn, though there was some factual dispute as to whether the stop was justified on that ground; one witness claimed that Steskal had, in fact, signaled.

Three witnesses saw Steskal in April 1999, soon after the second traffic stop. One testified that Steskal was nervous about being stopped by the police again; another found Steskal was very fearful of the police and convinced he was under surveillance; and the third recounted Steskal's belief the police would kill him. A witness who saw Steskal in June, just before the crime, testified that Steskal was distraught about his failing marriage and continued to believe the police were following him.

Dr. Roderick Pettis, the defense psychiatrist, testified that after the traffic stops, Steskal experienced psychotic delusions about being killed by law enforcement officers and withdrew to a camp in the mountains. Steskal was suicidal the day before the crime, when he had to return to town for legal proceedings related to his traffic stop. Dr. Pettis explained that Steskal's screaming and banging at the apartment complex was evidence that his despair and stress had reached extreme levels. On cross-examination, Dr. Pettis acknowledged a report of statements from Steskal's wife, who told investigators that immediately after the crime, Steskal exclaimed to her, " 'Oh, my God, what did I do, why did I do that?' " He confessed to shooting Deputy Riches, saying, " 'I don't know why I shot him.' " Dr. Pettis testified that the report did not alter his opinion that Steskal was experiencing significant fear and distress before the shooting.

A police psychologist described a "fight or flight" response, an automatic and sometimes unconscious reaction to danger. He explained such a response was more likely to occur in individuals who experience paranoia and could account for responses to fear that involved excessive violence.

Based on this evidence, defense counsel requested that the trial court instruct the jury on voluntary manslaughter, as well as imperfect self-defense, on a theory that Steskal actually but unreasonably believed he had to shoot Deputy Riches in order to defend himself. The trial court denied the request on the ground that the evidence did not support giving the instruction. The court concluded that Steskal's outburst at the apartment complex just before the shooting and his comments to the store clerk reflected anger rather than fear. Although there was evidence Steskal feared OCSD deputies generally, the court found no evidence he harbored a specific belief, real or imagined, that Deputy Riches posed an imminent threat at the time of the shooting, as would be required to establish imperfect self-defense. The court also found that by carrying a semiautomatic weapon into the 7-Eleven, Steskal himself created the circumstances of the shooting and was not entitled to invoke the doctrine of imperfect self-defense in any event.

### b. Discussion

"A trial court must instruct on all lesser included offenses supported by substantial evidence." (*People v. Duff* (2014) 58 Cal.4th 527, 561.) Although instruction on a lesser included offense "is not required when the evidence supporting such an instruction is weak" (*People v. Vargas* (2020) 9 Cal.5th 793, 827) or based on speculation (*People v. Westerfield* (2019) 6 Cal.5th 632, 718), it is required when the lesser included offense is

supported by " 'evidence that a reasonable jury could find persuasive' " (*People v. Lewis* (2001) 25 Cal.4th 610, 645). " 'Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.' " (*People v. Flannel* (1979) 25 Cal.3d 668, 685; see also *People v. Turner* (1990) 50 Cal.3d 668, 690.) We review independently whether the trial court erred in rejecting an instruction on a lesser included offense. (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

Voluntary manslaughter — an unlawful killing without malice — is a lesser included offense of murder, an unlawful killing with malice aforethought. (*People v. Booker*, *supra*, 51 Cal.4th at p. 181.) "Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but unreasonable belief that he is in imminent danger of death or great bodily injury." (*People v. Duff*, *supra*, 58 Cal.4th at p. 561.) "To satisfy the imminence requirement, '[f]ear of future harm — no matter how great the fear and no matter how great the likelihood of the harm — will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' " (*People v. Trujeque* (2015) 61 Cal.4th 227, 270.)

Steskal argues that evidence of his delusional fear of OCSD deputies supported an inference that he perceived imminent danger when Deputy Riches arrived at the 7-Eleven. The Attorney General asserts that this claim is precluded by *People v. Elmore* (2014) 59 Cal.4th 121, in which we held that "purely delusional perceptions of threats to personal safety cannot be relied upon to claim unreasonable self-defense," as opposed to claiming legal insanity. (*Id*. at pp. 138–139; see *id*. at p. 141.) Steskal counters that his perception was not " 'purely delusional' " (*id*. at p. 138) because he did accurately perceive that Deputy Riches was a law enforcement officer, though his

reaction to that fact was distorted by mental illness. We need not resolve this debate because, as the trial court correctly concluded, the evidence provided no substantial support for a claim that Steskal acted out of any fear of imminent peril, whether delusional or not.

Steskal did present evidence of his ongoing fear of law enforcement and the possibility he experienced a "fight or flight" response to seeing Deputy Riches in his vehicle. But while the jury could have inferred from this evidence that Steskal believed he was in some danger at the time of the killing, this evidence alone did not constitute substantial evidence that Steskal opened fire on the officer because he perceived him as posing "a risk of imminent peril" that could be met only through use of deadly force. (*People v. Simon* (2016) 1 Cal.5th 98, 133; see *People v. Manriquez* (2005) 37 Cal.4th 547, 582 [evidence that the "defendant may have harbored some fear of future harm" from the victim is insufficient to support an imperfect self-defense theory].) While "[t]he testimony of a single witness, including the defendant, can constitute substantial evidence" to support a voluntary manslaughter instruction (*People v. Lewis*, *supra*, 25 Cal.4th at p. 646), none of the evidence here lent substantial support to a theory of imperfect self-defense; Steskal himself "did not testify, and there is no evidence he ever told anyone that he had acted out of fear" (*Simon*, at p. 134). His remarks immediately after the shooting offered no indication that he feared Deputy Riches at all, much less that he feared imminent harm, and he did not present other evidence to show what had motivated his actions.

The circumstances of the crime indicated that Steskal "was the aggressor in the[] confrontation" with Deputy Riches, not the other way around. (*People v. Simon*, *supra*, 1 Cal.5th at

p. 133.) Shortly before Steskal shot Deputy Riches, a witness heard him loudly cursing the world and, in response to an effort to calm him, proclaiming, "Fuck that, I have guns, I have ammunition." Armed with a high-powered assault rifle, Steskal went to a nearby 7-Eleven that was a regular meeting place for OCSD deputies. Inside the store, Steskal flaunted the gun, asking the store clerk if she was afraid of it, and told her he carried it for protection against the "fucking law." When Deputy Riches arrived, the clerk watched as Steskal strode without hesitation toward the patrol car and opened fire while Deputy Riches was still seated and before he had the opportunity to access his weapon. Steskal concedes there was no evidence Deputy Riches threatened him in any way.

Without evidence that Steskal "possessed an actual but unreasonable belief of imminent danger of death or great bodily injury," the trial court did not err as a matter of state law when it refused to give voluntary manslaughter instructions. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649.) Nor was there federal constitutional error, since "the constitutional requirement that capital juries be instructed on lesser included offenses extends only to those lesser included offenses supported by substantial evidence." (*People v. Duff, supra*, 58 Cal.4th at p. 562.)

### 2. *Scope of expert testimony*

Steskal claims the trial court abused its discretion and violated his right to present a defense by sustaining the prosecution's objections to three questions defense counsel posed to Dr. Pettis about events leading up to the crime. Steskal argues that he was entitled to present the excluded testimony as a basis for Dr. Pettis's opinion under Evidence Code section

802, which says a witness may provide "the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." Steskal's claim lacks merit.

The first two questions defense counsel posed to Dr. Pettis asked him to relate (1) what Steskal said about having a "psychotic" reaction to messages on the radio the morning before the crime and (2) how Steskal described his behavior that day. The trial court sustained hearsay objections to both questions. We find no error in the court's ruling.

As we have recently explained, "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.) Dr. Pettis's responses to the questions were inadmissible unless Steskal's statements came within a hearsay exception. (*Ibid*.) Steskal did not invoke any such exception in the trial court, nor does he now invoke such an exception on appeal.

Steskal instead asserts that *Sanchez* is inapplicable because the testimony concerned delusional beliefs rather than statements offered as "true and accurate." (*People v. Sanchez, supra*, 63 Cal.4th at p. 686.) We reject this contention. The hearsay in question was not the content of the messages Steskal purportedly heard from the radio, but Steskal's report that he heard such messages at all and experienced a "psychotic" reaction as a result. The defense sought to present this out-of-court description of Steskal's distorted thinking, on which Dr. Pettis's opinion had relied, as true and accurate. Such reliance on out-of-court statements, introduced through the

13

medium of expert testimony, is precisely what *Sanchez* prohibits.

Steskal also claims the trial court erred in sustaining objections to a third question: whether anything about Steskal's behavior at the apartment complex in the "early morning hours" on the day of the crime caused Dr. Pettis to doubt that Steskal was experiencing a mental breakdown. The prosecutor objected that the question called for hearsay and referred to facts not in evidence. The trial court sustained the objection without comment.

The neighbor who testified about Steskal's behavior witnessed it at approximately midnight and the crime occurred just before 1:00 a.m. The question about Steskal's behavior in the "early morning hours" therefore seemed to address behavior *after* the crime that was not in evidence and the related implication that Dr. Pettis had learned of it through out-of-court statements, proper bases for excluding the testimony. In subsequent questioning, it appeared that the defense simply misstated the timing and had been referring to the commotion Steskal caused at the apartment complex before the shooting. Defense counsel could have, but did not, offer any clarification in response to the prosecution's objection.

We conclude that the trial court did not abuse its discretion by sustaining prosecution objections to the three questions — particularly when Steskal "made no offer of proof at trial explaining why the witness should have been permitted to answer" them (*People v. Lightsey* (2012) 54 Cal.4th 668, 727) — and that the application of ordinary rules of evidence did not impermissibly interfere with Steskal's constitutional right to present a defense (*People v. O'Malley* (2016) 62 Cal.4th 944,

995).  Furthermore, if there had been error, we would conclude that it was harmless.

Although Dr. Pettis was not allowed to detail Steskal's description of having a "psychotic" reaction to the radio on the day of the crime, based on numerous other sources and anecdotes and Steskal's lengthy history of mental illness Dr. Pettis testified at length about what he regarded as Steskal's profound mental health crisis in the weeks, days, hours, and minutes before the shooting.  Among other conclusions, Dr. Pettis testified that Steskal was extremely paranoid and unable to process information properly; that he was terrified that he was going to be killed; and that he acted on bizarre delusions that he was being monitored.  Although the trial court sustained one objection to testimony about Steskal's behavior at the apartment complex, the defense was nonetheless able to question Dr. Pettis about it, eliciting Dr. Pettis's opinion that it showed Steskal to be in "extreme despair," delusional, and "very decompensated" just before the shooting.  Under these circumstances, it is not reasonably probable that an outcome more favorable to Steskal would have resulted had the jury learned about one or two of Steskal's postarrest statements that Dr. Pettis considered (*People v. Watson* (1956) 46 Cal.2d 818, 836), and any federal constitutional error would have been harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24).

### 3.  *Prosecutorial misconduct*

Steskal contends the prosecutor committed misconduct during his guilt phase closing argument by invoking sympathy for the victim, inviting the jury to draw an adverse inference from Steskal's failure to call his wife as a witness, and arousing

prejudice against Steskal. Steskal claims the argument violated both state law and his federal constitutional right to a fair trial. We conclude that no prejudicial misconduct occurred.

### a. Background

During his guilt phase closing, the prosecutor argued that Deputy Riches saw Steskal in the 7-Eleven with a gun and was "a hero cop" for pulling up to the store with his lights flashing to respond to a potentially dangerous situation. A visual aid also listed "hero cop" in the overview of evidence for the jury. After the defense objected, the prosecutor explained his theory: Deputy Riches tried to draw Steskal out of the store by announcing his arrival, thus risking his life to ensure Steskal did not harm the store clerk. The trial court concluded the "hero" reference was not improper but ordered the prosecutor to explain that he was not seeking sympathy for Deputy Riches and to remove the visual aid as soon as he finished his presentation.

The prosecutor prefaced his remaining remarks about Deputy Riches's concern for the store clerk by stating: "This is about whether the defendant committed this crime. We are not talking about sympathy for Brad Riches. That's not what this is about." Instructions to the jury included CALJIC No. 1.00, which informed jurors they must not be influenced by sympathy, a point the defense highlighted in closing.

The prosecutor also argued that Steskal drove off "like a coward" after shooting Deputy Riches. The defense objected to the characterization, arguing that the prosecutor had gone "over the top" arguing that Deputy Riches was a hero and had "just swung the pendulum down to the lower ends of the scale" by calling Steskal a coward. The court admonished the jury to

disregard the term "coward" but rejected counsel's request to advise the jury that the prosecutor had committed misconduct.

During his rebuttal, the prosecutor commented on Steskal's allegedly long history of paranoia and questioned why, when he had carried an assault rifle for protection for over a decade, he had not used it until the night he shot Deputy Riches. The prosecutor observed that the defense had not explained "the trigger of why that day, out of the 14 years, all of a sudden the defendant decided to act out." Addressing this evidentiary gap, the prosecutor argued: "Now, the person that was perhaps the best witness to talk about the defendant before the murder and after the murder, who I can't call because of the marital privilege, they don't call. They don't call Nannette Steskal."

Evidence established that Nannette and Steskal were married but separated and that she was dating other men. During the cross-examination of Dr. Pettis, the prosecutor highlighted some of the records Dr. Pettis considered, including those that showed Steskal confessed the crime to his wife, she was driving him to the mountains when OCSD deputies stopped them and arrested Steskal, and she later lied to investigating officers when questioned about the circumstances surrounding the crime.

The defense objected to the prosecutor's comment as "improper," arguing that Nannette could assert a Fifth Amendment privilege against self-incrimination to avoid testifying. The prosecutor noted that Nannette was on Steskal's witness list and countered that, because the statute of limitations on any charges against her had run, she had no privilege to assert. The trial court observed that the question of privilege could raise "other considerations," notwithstanding

any statute of limitations. The court explained: "I just don't want to go into all this explanation with the jury as to the various possibilities, and I think that is fair because it is . . . a give or take, and there is [*sic*] some legal considerations the court is not prepared to make at this point in time." The trial court then sustained the defense objection to any further comments about Nannette's testimony but rejected a defense motion to strike the prosecutor's remarks about the defense's failure to call her as a witness.

### b. *Discussion*

Under state law, " '[a] prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct . . . .' " (*People v. Friend* (2009) 47 Cal.4th 1, 29.) Prosecutorial misconduct violates the federal Constitution when it results in a fundamentally unfair trial. (*Ibid.*) When a claim of misconduct is based on remarks to the jury, we consider whether there is a reasonable likelihood the jury construed the remarks in an improper fashion. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.)

Steskal claims the prosecutor's reference to Deputy Riches as a "hero" was "a blatant appeal for sympathy" that constituted misconduct. Our cases make clear that "[a]lthough a prosecutor may vigorously argue the case, appeals to sympathy for the victim during an objective determination of guilt fall outside the bounds of vigorous argument." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 920.) The prosecutor's argument did not cross this line, however. The prosecutor's description of Deputy Riches was based on evidence of the conduct that led to his fatal confrontation with Steskal; it was "fair comment on the evidence and did not suggest 'that emotion may reign over reason' or

invite 'an irrational, purely subjective response.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1343.) In any event, there is no reasonable likelihood the characterization improperly inflamed the jury when the reference was brief, the prosecution and defense both informed the jury that sympathy for Deputy Riches was not relevant, and the trial court instructed the jury that sympathy was an inappropriate consideration. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 857.)

Steskal also contends the prosecutor committed misconduct by commenting on the defense's failure to call Nannette as a witness. He asserts that any comment that invites a jury to draw an adverse inference from the defendant's failure to call a witness violates federal due process protections because it undermines the presumption of innocence and ignores the variety of reasons a party may have for not calling a witness despite his or her ability to provide favorable testimony. He further claims that it was misconduct to comment on the failure to call Nannette because she could have refused to testify by invoking a marital communications privilege under Evidence Code section 980. Steskal did not raise these arguments in the trial court, and he has not established it would have been futile to do so. He has therefore forfeited them. We find no grounds for reversal in any event.

We have long held that a prosecutor may make " 'comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 299; see, e.g., *People v. Gonzales*, *supra*, 54 Cal.4th at p. 1275 ["it is neither unusual nor improper to comment on the failure to call logical witnesses"]; *People v. Szeto* (1981) 29 Cal.3d 20, 34.) Steskal acknowledges this authority but urges us to follow

what he characterizes as "the trend of the law . . . to substantially narrow the circumstances under which a prosecutor can comment on a defendant's failure to call a particular witness."

Steskal points to various out-of-state cases, which he argues stand for two primary propositions. First, a jury should not be invited to draw an adverse inference from the defendant's failure to call particular witnesses when that inference "would favor the State in a factual dispute over an element of the crime on which the State clearly bears the burden of proof." (*State v. Hill* (2009) 199 N.J. 545, 565 [974 A.2d 403, 416] [prohibiting jury instruction]; *Jackson v. State* (Fla. 1991) 575 So.2d 181, 188 [error to allow reference in closing argument].) Second, an inference regarding the content of testimony that has not been offered presents "dangers of speculation and conjecture" (*State v. Brewer* (Me. 1985) 505 A.2d 774, 776), particularly considering that " 'questions of demeanor and credibility, hostility, and the like may influence the [party] not to produce a witness whose testimony might be entirely harmful to the [other party]' " (*State v. Tahair* (2001) 172 Vt. 101, 108 [772 A.2d 1079, 1085]).

Our cases have acknowledged the same concerns. We have explained that "a rule permitting comment on a defendant's failure to call witnesses is subject to criticism if applied when the reason for his failure to do so is ambiguous, or if the defendant is simply standing on his right to have the state prove his guilt," and that a trial court may disallow such comment for these reasons. (*People v. Ford* (1988) 45 Cal.3d 431, 447.) Our cases also recognize that "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and . . . an improper statement that a

defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340; see *People v. Bennett* (2009) 45 Cal.4th 577, 596 [comments do not impermissibly shift the burden of proof when the prosecutor does not "state or imply that defendant had a duty to produce evidence"].)

To the extent Steskal asks us to further delineate the bounds of proper comment on the defendant's failure to present certain witnesses, this case does not present an appropriate occasion to do so. Steskal largely secured at trial the limitation he now seeks on appeal. Once the prosecutor made reference to Nannette's absence from trial, the trial court sustained Steskal's objection and prevented the prosecutor from making any further references. The court did so before the prosecutor could argue that the omission of Nannette's testimony justified an adverse inference.

Furthermore, even if the prosecutor's solitary reference to Nannette's absence from trial was improper — whether due to general concerns about such comments or the possibility Nannette could have invoked marital privilege to avoid testifying — there is no reasonable likelihood the jury construed the reference in an objectionable fashion. (*People v. Gonzales*, *supra*, 54 Cal.4th at p. 1275.) We consider the remarks in the context of the argument as a whole and " ' "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.) Although the jury could have understood the prosecutor's comment to imply that Nannette would undermine Steskal's mental state defense, the jury was aware of "equally plausible" reasons for her failure to testify (*People v. Ford*, *supra*, 45 Cal.3d at p. 445): She had been

separated from Steskal, involved in his efforts to evade law enforcement after the shooting, and dishonest when questioned about Steskal's actions before and after the crime.  Under these circumstances, jurors could conclude that estrangement, credibility issues, or Nannette's own legal troubles explained her absence from trial.  "Despite the prosecutor's brief remark, the jury was capable of deciding, as a matter of common sense, whether [she] was a logical or reliable witness."  (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1216.)

Moreover, however the jury may have understood it, the prosecutor's reference to Nannette's absence "was tangential in any event."  (*People v. Gonzalez*, *supra*, 51 Cal.3d at p. 1216.)  The prosecution did not dispute the key elements of Steskal's defense — that he suffered from mental illness that caused him to fear law enforcement officers.  Instead, the prosecution argued that any fear Steskal experienced did not negate premeditation and deliberation:  "[I]n fact, if you think about someone who is fearing a situation and wants to prepare to meet that fear, wants to protect themselves, if that's truly what they are feeling[,] . . . that person is going to premeditate and deliberate more than anybody else."  The prosecution pointed to evidence that Steskal was cursing and yelling just before leaving for the 7-Eleven, took an assault rifle with him to the store, told the store clerk seconds before the shooting that he intended to use his gun to protect himself against the "fucking law," and launched an attack on Deputy Riches the moment he arrived.  As the prosecutor argued, fearful or not, Steskal appeared to be "a man who has a plan to do something.  To provoke, or if provoked, to respond."  This evidence was far more damaging than any inference the jury might have drawn about the likelihood that Nannette's testimony would be unhelpful to

Steskal's mental state defense. Thus, even if the prosecutor's observation about Nannette's failure to testify were considered misconduct, we would find no prejudice, particularly when the comment was brief, "defendant's objection was immediately sustained . . . and the prosecutor did not return to the subject." (*People v. Bennett*, *supra*, 45 Cal.4th at p. 613; see *People v. Ghobrial* (2018) 5 Cal.5th 250, 289.)

Finally, Steskal contends the prosecutor appealed to the passion and prejudice of the jury when he referred to Steskal driving off "like a coward." Steskal asserts that this comment, when combined with the description of Deputy Riches as a hero and comment on Nannette's failure to testify, established a pattern of misconduct that violated his federal constitutional rights and deprived him of a fair trial. We are not persuaded. "[T]he use of derogatory epithets to describe a defendant is not necessarily misconduct" where, as here, "[t]he prosecutor's remarks . . . were founded on evidence in the record and fell within the permissible bounds of argument." (*People v. Friend*, *supra*, 47 Cal.4th at p. 32.) In any event, the trial court admonished the jury to disregard the "coward" reference and we "presume the jury heeded the admonition and that any error was cured." (*People v. Dickey* (2005) 35 Cal.4th 884, 914.) Given this resolution, we find no prejudicial misconduct, nor do we discern any pattern of misconduct that could have affected the fairness of Steskal's trial or otherwise violate his federal constitutional rights.

### 4. *Jury view of Deputy Riches's patrol car*

Steskal contends the trial court erred by allowing a jury view of Deputy Riches's patrol car and asserts the evidence was so inflammatory it denied him a fair trial. We find no error.

23

### a. Background

Before trial, the prosecution moved to allow the jury to view the patrol car and to have the car transported to the courthouse for this purpose. The defense opposed the motion, arguing that allowing the jury to view the patrol car, which was riddled with bullet holes, was more prejudicial than probative under Evidence Code section 352. Defense counsel stated, "I can't imagine anyone viewing that patrol car not gasping and not being overwhelmed with a whole variety of emotions. It is really a horrible sight." Steskal did not dispute the facts a jury view would highlight: He fired 30 rounds into the patrol car from close range as Deputy Riches sat trapped inside. The prosecution added that seeing the vehicle would allow the jury to appreciate where the bullets struck in relation to Deputy Riches's position. Overruling the defense objection, the trial court concluded that when defendant was the person who "blew up the car," there was no reason the jury should not see it; "[i]t is not like looking at Deputy Riches' body. We are keeping out most of those photographs."

Steskal moved for reconsideration. After viewing the patrol car, the trial court denied the motion, stating: "I think it is extremely probative. Certainly, probative value outweighs any prejudicial effect. . . . I think [it does] nothing but assists the trier of fact as far as the position of the defendant and the position of the victim."

At trial, after the prosecutor marked a number of photographs of the patrol car he intended to introduce, the defense renewed its objection to the jury view of the car as cumulative of the photographs. The trial court again overruled the objection, observing that most of the photographs only

showed a portion of the vehicle and those showing the entire car were from a higher angle than a person would get standing in front of the car — "seeing the car is not only more probative than cumulative, but very beneficial to the trier of fact, because it gives you the perspective of the shooter and the victim that you don't get looking at the photographs." The jury later viewed the patrol car for six minutes on court premises.

The prosecution also introduced photographs of the patrol car showing some of the bullet holes in the hood and windshield, the shattered driver's window, closeup images of damage to the interior, and a view of the vehicle from a distance. In addition, the prosecution played surveillance videotapes that recorded events from inside the 7-Eleven, capturing the sound of gunshots after Steskal left the store and a distant glimpse of the shooting. The prosecution also presented the testimony of witnesses including a 7-Eleven employee who saw Steskal walking close to the patrol car as he fired his rifle; first responders who described finding Deputy Riches; a criminalist who collected evidence and attempted to determine the trajectory of shots; and a pathologist who described Deputy Riches's wounds. A photograph showing Deputy Riches's body at the hospital further revealed the extent of some of his injuries.

### b. Discussion

"The trial court may allow the jury to 'view the place in which the offense is charged to have been committed, or in which any other material fact occurred.' ([Pen. Code, ]§ 1119.) We review for abuse of discretion a trial court's ruling on a party's motion for a jury view." (*People v. Davis* (2009) 46 Cal.4th 539, 610.)

Evidence Code section 352 "permits the court to exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice." (*People v. Powell* (2018) 5 Cal.5th 921, 961.) "During the guilt phase, there is a legitimate concern that crime scene [evidence] can produce a visceral response that unfairly tempts jurors to find the defendant guilty of the charged crimes." (*People v. Box* (2000) 23 Cal.4th 1153, 1201, disapproved on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.) However, "[s]o long as the probative value of graphic or disturbing material is not substantially outweighed by its prejudicial effects, a prosecutor is entitled to use such evidence to 'present a persuasive and forceful case.'" (*People v. Merriman* (2014) 60 Cal.4th 1, 80; see *People v. Fayed* (2020) 9 Cal.5th 147, 196 [prosecution entitled to present " ' "grim" ' " evidence of violent crime]; *People v. Booker*, *supra*, 51 Cal.4th at p. 171 [prosecution "is not required to sanitize its evidence"].)

Steskal claims the patrol car did not have substantial probative value because it did not address disputed issues. A defendant, however, "cannot prevent the admission of relevant evidence by claiming not to dispute a fact the prosecution is required to prove beyond a reasonable doubt. The jury was entitled to learn that the physical evidence . . . supports the prosecution's theory of the case." (*People v. Rountree* (2013) 56 Cal.4th 823, 852; see *People v. Cowan* (2010) 50 Cal.4th 401, 476 ["defendant's not guilty plea put in issue all of the elements of the charged offenses, including the elements he conceded"].)

As evidence of the volume and aim of shots directed at Deputy Riches from close range, the patrol car was "highly relevant to show the manner in which the [victim was] killed"

(*People v. Ramirez* (2006) 39 Cal.4th 398, 453; see *People v. Brasure* (2008) 42 Cal.4th 1037, 1054), to "illustrate and corroborate the testimony given by [witnesses] regarding the circumstances of the crime" (*People v. Scheid* (1997) 16 Cal.4th 1, 18), and to support the conclusion that the killing was deliberate (*People v. Booker*, *supra*, 51 Cal.4th at p. 171; *People v. Riggs* (2008) 44 Cal.4th 248, 304; cf. *People v. Salazar* (2016) 63 Cal.4th 214, 245 [multiple gunshots at close range supported theory of premeditation and deliberation]; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [same]).

Steskal contends the patrol car also lacked probative value because it was cumulative of the photographs, videotapes, and witness testimony before the jury. But as the trial court observed, viewing the patrol car in person afforded a perspective not evident in the photographs, which showed only portions of the vehicle. The same is true of the videotapes and eyewitness testimony. The prosecutor was not required to rely solely on those pieces of evidence when viewing the vehicle "would enhance the jury's understanding of the issues." (*People v. Cowan*, *supra*, 50 Cal.4th at p. 476; see *People v. Brasure*, *supra*, 42 Cal.4th at p. 1054.)

Steskal claims the jury view was unduly prejudicial because it had the emotional impact of "a death scene" strewn with bullet holes, shattered glass, and torn, blood-soaked fabric. The prejudice with which Evidence Code section 352 is concerned, however, is not damage to a defense that is caused by relevant, noncumulative, and highly probative evidence. (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) Graphic evidence in a murder case is always disturbing (*People v. Thomas* (2012) 53 Cal.4th 771, 807) but it is not inadmissible simply because it is unpleasant to view (see, e.g., *People v. Fayed*, *supra*, 9 Cal.5th

at p. 196 [victim's blood-soaked shirt and pants]; *Thomas*, at p. 805 [victims' clothing stained with blood and tissue]; *People v. Riggs*, *supra*, 44 Cal.4th at p. 303 [crime scene and autopsy photographs of victim]; *People v. Brasure*, *supra*, 42 Cal.4th at pp. 1053–1054 [photographs of victim's decomposing and tortured body]; *People v. Lewis*, *supra*, 25 Cal.4th at p. 642 [photographs and videotape showing victims in blood-splattered surroundings]). " 'The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors.' " (*People v. Streeter* (2012) 54 Cal.4th 205, 238.)

Steskal does not claim that viewing the patrol car exposed the jury to any "sensationalized illustrations of a crime" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1150) or "gratuitous details" unrelated to his actions (*People v. Caro* (2019) 7 Cal.5th 463, 503). " 'We will not disturb a trial court's exercise of discretion under Evidence Code section 352 " '*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 480.) The trial court's reasoned decision to allow a jury view of the patrol car was not an abuse of this discretion. (See *People v. Spencer* (2018) 5 Cal.5th 642, 681 [trial court is better able to assess prejudice from the display of physical evidence].)

Steskal also claims that the jury view of the patrol car violated his federal due process rights, arguing that it was inherently inflammatory and had no substantial, noncumulative probative value. Although the Attorney General

argues that Steskal forfeited his due process argument by failing to object on that basis at trial, we have reached an asserted due process violation when it was based on the same theory of exclusion set forth under Evidence Code section 352. (*People v. Partida* (2005) 37 Cal.4th 428, 438–439.) But Steskal's claim fails on the merits. " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) The jury view of the patrol car did not have such an effect on Steskal's trial.

### 5. *Cumulative error*

Steskal argues that even if harmless in isolation, the guilt phase errors he asserts were cumulatively prejudicial. Discussing the prosecutor's reference to Nannette's absence from trial, we explained that even if prosecutorial misconduct occurred it was not prejudicial. As we have found no other errors, there is no cumulative prejudice that could have denied Steskal a fair trial.

## B. Penalty Retrial Issues

### 1. *Admission of impeachment testimony*

Steskal contends the trial court abused its discretion when it allowed the prosecution to reference the facts of other death penalty cases during the cross-examination of defense psychiatrist Dr. Pettis at the penalty retrial. We reject this claim.

In cross-examining Dr. Pettis, the prosecutor asked him about two prior death penalty cases in which he had testified for the defense. Dr. Pettis testified that his role in the first case had been to evaluate whether the defendant was competent to be

executed. When the prosecutor referenced the fact that the defendant in that case had been convicted of raping and murdering two women, Dr. Pettis indicated that he did not recall the crime but confirmed he had concluded the defendant lacked mental competence to be executed. When the prosecutor asked whether he was biased against the death penalty, Dr. Pettis responded that he was not. The prosecutor then observed that the defendant in the second case was convicted of raping a woman and setting her on fire. Dr. Pettis testified regarding his conclusion that the second defendant suffered from mental illness at the time of his crimes.

The defense objected to the first exchange on relevance grounds. Later, outside the presence of the jury, defense counsel argued that allowing the jury to hear about the crimes in Dr. Pettis's prior cases served no purpose but to suggest that "this guy will get on the stand in any horrific case and testify for the defense." The trial court overruled defense objections based on relevance and Evidence Code section 352. But it advised the prosecution to keep any similar questioning brief because "the weighing process leans more towards prejudicial." Steskal contends it was error for the trial court to permit the questioning at all.

"It is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination." (*People v. Farnam* (2002) 28 Cal.4th 107, 187.) " '[T]he scope of cross-examination of an expert witness is especially broad . . . .' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 123; see Evid. Code, § 721, subd. (a).) "The prosecutor may properly cross-examine a witness to show bias, prejudice, interest, hostility or friendship toward a party that would bear on the question of the credibility of the witness. [Citations.] An expert's testimony in prior cases

30

involving similar issues is a legitimate subject of cross-examination when it is relevant to the bias of the witness." (*DeHoyos*, at p. 123.) A "witness's personal philosophical opposition to the death penalty is relevant to his credibility." (*People v. Bennett*, *supra*, 45 Cal.4th at p. 606.)

A prosecutor may refresh an expert's recollection of prior matters "by providing a brief recitation of their salient facts," to allow the expert an opportunity to defend past conclusions. (*People v. Shazier* (2014) 60 Cal.4th 109, 137.) In *Shazier*, we concluded that the prosecutor did not commit misconduct by reciting potentially inflammatory facts from prior cases involving sexually violent predators when it was an "effort to attack the validity of [the expert's] opinions in the other cases." (*Id.* at p. 139.) Similarly, in *People v. Zambrano*, *supra*, 41 Cal.4th 1082, we observed that it was permissible for the prosecutor to challenge an expert on prison adjustment by referencing the facts of a prior case in which the expert found the defendant posed no safety risk in prison though convicted of four murders and six attempted murders. (*Id.* at pp. 1164–1165.) There, we noted that "[t]he prosecutor was entitled to expose bias in the witness by showing his propensity to advocate for criminal defendants even in extreme cases." (*Id.* at p. 1165.)

Here, by contrast, the prosecution inquiry was limited to showing that Dr. Pettis made mental health findings favorable to the defense in two prior death penalty cases involving particularly horrifying crimes. The facts of the prior cases were relevant neither to the validity of Dr. Pettis's conclusions in those matters, as was the case in *Shazier*, nor to any potential bias in his findings, as in *Zambrano*. Instead, the prosecutor's questioning tended to imply that Dr. Pettis's willingness to testify for the defense in cases involving such crimes, without

more, reflected a bias against the death penalty.

Assuming for the sake of argument that the questions were improper, we conclude that they were harmless. The prosecutor's reference to other case facts was brief, Dr. Pettis testified that he was not biased against the death penalty, and the impact of the questioning was minimal given the prosecutor's extensive and detailed cross-examination of Dr. Pettis's findings, which spanned four days.

### 2. *Prosecutorial misconduct*

Steskal contends the prosecutor committed misconduct in his closing argument at the penalty retrial, violating state law and federal due process protections. We conclude that no misconduct occurred.

Steskal first claims there were two instances in which the prosecutor argued that Dr. Pettis's testimony concerning mitigating factors was in fact aggravating. Citing evidence admitted under Penal Code section 190.3, factor (b), that Steskal had a weapon in his jail cell, the prosecutor remarked on Steskal's dangerousness in custody: "Do you think for a moment that the defendant wouldn't use that? Look back at Dr. Pettis'[s] testimony . . . . He said the defendant is very mild and meek . . . except when he is into this delusion thing, and then he just goes all out of control . . . . [¶] So if you tend to believe this . . . you have a person right now that is capable and willing to kill someone in authority." Later, when discussing mitigating factors, the prosecutor noted that "a lack of mitigation in those factors does not mean aggravation. But there are things that you can consider in mitigation that would reduce mitigation." The prosecutor argued that "if Dr. Pettis has some credibility with you, you may want to look at this part of his testimony,

where he is saying that the defendant . . . when he gets confronted with authority figures, you see what happens.  [¶] That would be less than mitigating, if that is in fact true."

Preliminarily, the Attorney General asserts that Steskal failed to preserve his claim.  Defense counsel raised his objections in a motion for mistrial the day after the prosecutor's argument and before the defense had completed its closing remarks.  " ' "It is now well settled that an appellate court will not consider a claim as to the misconduct of counsel in argument unless objection is so made." [Citation.]  "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 801.)  We have explained that when a defendant's objections to prosecution statements in a motion for mistrial are "specific enough for the trial court to craft suitable corrective instructions" and are made before the end of closing argument, "thus providing the trial court with an opportunity to admonish the jury prior to the start of deliberations," the challenge may be preserved.  (*Ibid.*)  Though the form and timing of Steskal's objection may not have been "ideal" (*ibid.*), Steskal's motion for mistrial was sufficient to preserve the claim.

Turning to the merits, we first consider Steskal's claim that the prosecutor improperly urged the jury to consider mitigating evidence as aggravating when he discussed Steskal's possession of weapons in jail, saying that Dr. Pettis's testimony, if believed, tended to show Steskal would be "capable and willing to kill someone" while incarcerated.  In *People v. Edelbacher* (1989) 47 Cal.3d 983, we held that evidence of a defendant's character and background is admissible under Penal Code

section 190.3, factor (k), "only to *extenuate* the gravity of the crime; it cannot be used as a factor in aggravation." (*Edelbacher*, at p. 1033.) We later explained that a prosecutor may present "evidence of mental illness" in aggravation if it "relates to an aggravating factor listed in section 190.3"; that is so "even if it also bears upon a mitigating factor listed in that section." (*People v. Smith* (2005) 35 Cal.4th 334, 356.) Thus, although "general evidence regarding a defendant's mental state" may not be characterized as aggravating, mental state evidence may be considered in aggravation if, for example, it represents "specific evidence of the motivation behind the killing" and therefore is "relevant as a circumstance of the crime." (*Id.* at p. 355; see *People v. Nelson* (2011) 51 Cal.4th 198, 224 [" '[e]vidence that reflects directly on the defendant's state of mind contemporaneous with the capital murder is relevant under section 190.3, factor (a)' "].) It is not improper for a jury to consider evidence of the defendant's mental disorder in aggravation when it is not "strictly mitigating," but instead relates to the circumstances of the crime or another factor in aggravation. (*People v. Krebs* (2019) 8 Cal.5th 265, 349.)

Here, the prosecutor highlighted a circumstance of the crime — Steskal's asserted reason for killing Deputy Riches — as relevant to his future dangerousness toward correctional staff. We have observed that state of mind evidence " 'demonstrating [the defendant's] attitude toward his victims [is] highly probative' on the issue of future dangerousness." (*People v. Winbush* (2017) 2 Cal.5th 402, 477; see *People v. Rich* (1988) 45 Cal.3d 1036, 1123 [future dangerousness argument may be based on circumstances of the crime].) And " '[w]e have repeatedly declined to find error or misconduct where argument concerning a defendant's future dangerousness in custody is

based on evidence of his past violent crimes admitted under one of the specific aggravating categories of [Penal Code] section 190.3.'" (*People v. Tully* (2012) 54 Cal.4th 952, 1046.) The prosecutor did not commit misconduct by urging the jury to consider the potential danger Steskal posed to correctional staff in light of his possession of weapons admitted under Penal Code section 190.3, factor (b) and the delusional mistrust of authority he had asserted to explain the circumstances of his crime.

Steskal's objection to the prosecutor's argument that Steskal's asserted delusional overreaction to authority was "less than mitigating" also lacks merit. This was not an argument that the jury should consider mitigating defense evidence in aggravation, but that Steskal's mitigating evidence did not carry weight. "'"'A prosecutor does not mischaracterize such evidence [offered in mitigation] by arguing it should not carry any extenuating weight when evaluated in a broader factual context. We have consistently declined to criticize advocacy of this nature.'"'" (*People v. Weaver* (2012) 53 Cal.4th 1056, 1087.)

Steskal also claims the prosecutor committed misconduct in the course of arguing that the jury should discount defense expert testimony. When cross-examining Dr. Pettis, the prosecutor referenced a report in which Nannette claimed that Steskal told her what to say if she were questioned by the police. Dr. Pettis acknowledged that Nannette later lied when she was interviewed by investigating officers. She falsely said that she did not see Steskal take his gun to the 7-Eleven or come back with it, gave an excuse for Steskal deciding to shave his mustache immediately after the shooting, claimed that Steskal did not tell her what had happened, and denied knowing that Steskal put a gun in her car before she drove him away from the

apartment. Dr. Pettis testified that it was "conceivable" that Steskal and his wife had made an agreement to lie to the police.

In closing, the prosecutor argued that defense expert opinions were based on unreliable information. Overruling a defense objection to one such characterization, the trial court informed the jury: "[T]he lawyers are arguing what they perceive to be the facts. They are probably also going to argue inferences from these facts as they perceive them. You get to decide the facts, not the lawyers. So if they say something that may appear to be inconsistent with your recollection, it is your recollection that, obviously, you rely on and is important." Moments later, the prosecutor argued that Dr. Pettis had relied on Nannette's OCSD interviews even though they were "[r]eplete with lies" that she and Steskal had concocted to cover up the crime. The defense objected on the ground that the argument was based on a fact not in evidence, but the trial court overruled the objection. Steskal now contends the prosecutor committed misconduct by arguing that Nannette and Steskal had entered an agreement to cover up the crime.

The Attorney General argues that Steskal forfeited his claim by failing to specifically cite misconduct and request an admonition. We will assume, for the sake of argument, that Steskal's objection was sufficient to preserve the issue for appeal. (See *People v. Pearson* (2013) 56 Cal.4th 393, 434.) We find no misconduct. " 'The prosecution is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it.' " (*People v. Seumanu, supra,* 61 Cal.4th at p. 1363.) Given Dr. Pettis's testimony acknowledging the possibility of planned deception, the prosecutor could ask the jury to infer that Steskal and his wife agreed on her fabrications to the sheriff's

department. "It was a matter for the jury to decide whether the inference was faulty or illogical and . . . the court repeatedly reminded the jurors that argument was not evidence." (*People v. Tully*, *supra*, 54 Cal.4th at p. 1044.)

### 3. Admission of evidence depicting the victim and crime scene

Steskal contends that prosecution evidence illustrating the circumstances of the crime — a mannequin depicting Deputy Riches, photographs and a jury view of Deputy Riches's patrol car, and autopsy photographs — was unduly prejudicial, and therefore should have been excluded under Evidence Code section 352. He further contends that the admission of this evidence violated his federal constitutional rights to due process and a reliable penalty trial. We conclude that the trial court did not abuse its discretion in admitting the evidence and that no federal constitutional violation occurred.

Again, " '[p]rejudice' in the context of Evidence Code section 352 is not synonymous with 'damaging': it refers to evidence that poses an intolerable risk to the fairness of the proceedings or reliability of the outcome." (*People v. Booker*, *supra*, 51 Cal.4th at p. 188.) "[T]he court's discretion under Evidence Code section 352 to exclude evidence showing circumstances of the crime 'is much narrower at the penalty phase than at the guilt phase. This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences ([Pen. Code, ]§ 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer present.' [Citations.] At the penalty phase, the jury 'is *expected* to subjectively weigh the evidence, and the prosecution is entitled to place the capital offense and the offender in a morally bad light.' " (*People v. Bell*

(2019) 7 Cal.5th 70, 105–106.)  The trial court retains "its traditional discretion to exclude 'particular items of evidence' by which the prosecution seeks to demonstrate either the circumstances of the crime (factor (a)), or violent criminal activity (factor (b)), in a 'manner' that is misleading, cumulative, or unduly inflammatory."  (*People v. Box, supra*, 23 Cal.4th at p. 1201.)

### a.  *Mannequin depicting Deputy Riches*

At the penalty retrial, Steskal objected to the introduction of a life-sized mannequin dressed in Deputy Riches's bloody uniform.  There was vomit on the front shirt pocket and the dried blood blended in with the color of the uniform, which was dark green.  Rods placed in the mannequin reflected the location and trajectory of bullet wounds.  Ruling that the mannequin was admissible, the trial court observed that it was not going to "shock anybody's sensibilities."  The prosecutor referred to the mannequin during the pathologist's testimony to show the location of each wound as he described them.  During his closing argument, the prosecutor brought the mannequin out to show the concentration of shots directed to the upper left chest area, highlighting the aggravated nature of the crime.  When not in use during the testimony and closing argument, the mannequin was stored outside of the jury's view and was not placed in the jury room during deliberations.

Steskal asserts there was little probative value to the mannequin, given that the circumstances of the crime were not contested, and that the mannequin was prejudicial because it was "startlingly life-like" and the condition of the uniform was "shocking."  This argument is not persuasive; this court has repeatedly held that otherwise relevant evidence is not

inadmissible simply because it is graphic or because it depicts uncontested facts. (*People v. Thomas*, *supra*, 53 Cal.4th at p. 806.) In *Thomas*, for instance, although the cause and circumstances of death were not in dispute, we upheld the guilt phase introduction of life-sized mannequins representing slain officers, as well as their blood- and tissue-stained clothing. (*Id.* at pp. 805–806.) The trial court in this case did not err when it admitted similar evidence in Steskal's penalty retrial, a juncture in the proceedings when the constraints on its discretion to exclude the evidence were greater than they would have been in the guilt phase. (*People v. Bell*, *supra*, 7 Cal.5th at pp. 105–106.) We have long recognized that "[m]annequins may be used as illustrative evidence to assist the jury in understanding the testimony of witnesses or to clarify the circumstances of a crime" (*People v. Cummings* (1993) 4 Cal.4th 1233, 1291) and have "rejected challenges to the prosecution's use of mannequins to represent victims during the presentation of aggravating evidence" (*People v. Peoples*, *supra*, 62 Cal.4th at p. 753). We have similarly upheld the admission of a victim's stained clothing to show the circumstances of the crime (*People v. Spencer*, *supra*, 5 Cal.5th at p. 680), as well as the admission of photographs and videotape portraying actual victims in death (see, e.g., *People v. Henriquez* (2017) 4 Cal.5th 1, 40 [photographs]; *People v. Cunningham* (2015) 61 Cal.4th 609, 668 [photographs and videotape]). "[A]s unpleasant as these [depictions] may be, they demonstrate the real-life consequences of defendant's actions. The prosecution was entitled to have the penalty phase jury consider those consequences." (*Cunningham*, at p. 668.)

We also reject Steskal's claim that the mannequin was cumulative of other evidence such as the patrol car and

testimony by the pathologist and first responders. When used to illustrate the pathologist's testimony, as the mannequin did here, the "demonstrative evidence provides noncumulative value over the testimony itself by encapsulating what may otherwise be . . . confusing." (*People v. Caro*, *supra*, 7 Cal.5th at p. 510.) "[A] prosecutor is not required to rely solely on oral testimony when a visual image would enhance the jury's understanding of the issues." (*People v. Cowan*, *supra*, 50 Cal.4th at p. 476.)

We conclude the trial court acted within its discretion in finding that the probative value of the mannequin was not substantially outweighed by the risk of undue prejudice. "Consistent with our holding in *People v. Medina* (1990) 51 Cal.3d 870, 898–899 [274 Cal.Rptr. 849, 799 P.2d 1282] — a case where the prosecution entered into evidence a mannequin wearing a victim's bloodstained shirt — we find that '[t]he trial court was in a far better position than we to assess the potential prejudice arising from the display of such physical evidence.' Upon the record before us, we see no basis to upset its decision" (*People v. Spencer*, *supra*, 5 Cal.5th at p. 681) and conclude there was no violation of Steskal's federal constitutional rights (*People v. Henriquez*, *supra*, 4 Cal.5th at p. 29).

### b. *Jury view of Deputy Riches's patrol car*

As in the guilt phase, during the penalty retrial the trial court permitted the jury to view Deputy Riches's patrol car, over the defense's renewed objections. Steskal contends this ruling was error, asserting that the patrol car was inflammatory, was not relevant to any contested issue, and was cumulative of other evidence, including the mannequin, photographs of the patrol car, and witness testimony. We find no abuse of discretion.

Again, evidence may be admissible though undisputed (*People v. Thomas*, *supra*, 53 Cal.4th at p. 806; *People v. D'Arcy* (2010) 48 Cal.4th 257, 299), and it is not unduly prejudicial for " 'accurately portray[ing] the shocking nature of the crime[]' " (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1150). Furthermore, in the penalty retrial, the prosecution was entitled greater leeway " 'to establish the circumstances of the crime, including its gruesome consequences,' " and "to demonstrate the full extent of the suffering defendant inflicted on his victim." (*People v. Bell*, *supra*, 7 Cal.5th at p. 106.) " '[T]he penalty phase is an especially appropriate time to introduce [evidence] showing exactly what the defendant did.' " (*People v. Johnson* (2015) 61 Cal.4th 734, 767–768.)

We reject Steskal's assertion that a jury view of the patrol car was cumulative of other evidence in the penalty retrial. In our review of Steskal's similar guilt phase claim, we concluded that the vehicle was not cumulative of photographs and testimony. The same is true for the penalty retrial, where the prosecution introduced nearly identical evidence. Although the mannequin provided an additional depiction of the crime and Deputy Riches's wounds, the destruction of the patrol car uniquely illustrated the firepower Steskal wielded, the number and pattern of shots, and the vulnerability of Deputy Riches as he sat defenseless in the driver's seat — circumstances of the crime the prosecutor highlighted in closing.

We therefore conclude that in the penalty retrial, the patrol car evidence was "neither cumulative nor misleading and [was] highly probative of the penalty issues, demonstrating the deliberate and brutal nature of the crime." (*People v. Staten* (2000) 24 Cal.4th 434, 463.) The trial court's decision to admit the evidence was not an abuse of discretion or constitutional

error.

###   c.   *Admission of autopsy and patrol car photographs*

Steskal claims the trial court erred in admitting photographs that were unduly prejudicial. At issue were three autopsy photographs and 13 photographs of the patrol car and other property damaged in the shooting. We find no error.

The pathologist described 30 major wounds Deputy Riches sustained to his head, neck, chest, shoulder, and arms. Three autopsy photos admitted into evidence showed severe wounds to Deputy Riches's right hand and forearm. The prosecution later emphasized that Deputy Riches's right hand and weapon were struck by gunfire, leaving him defenseless.

A criminalist testified regarding her collection and analysis of bullet casings and other evidence at the scene. She explained how she attempted to recreate the position of the shooter by examining gunshot damage to the patrol car and nearby businesses. Photographs referenced during the criminalist's testimony and introduced into evidence depicted a view of the patrol car from a distance as it was found at the scene; bullet holes in the nearby businesses; the shattered driver's window taped in place to preserve bullet hole evidence; the interior of the vehicle, including closeup views of damage and Deputy Riches's revolver and radio found on the driver's seat and floor; trajectory rods placed in some of the bullet holes; and exterior views of bullet holes in the hood and windshield without the trajectory rods.

Steskal asserts that the photographs lacked probative value because they addressed matters that were not in dispute and were cumulative of other evidence. We are not persuaded.

Photographs that depict the crime scene and the victim's wounds are relevant to the penalty determination as evidence of the circumstances of the crime (*People v. Booker, supra,* 51 Cal.4th at p. 187) " ' "and the prosecution is 'not obliged to prove these details solely from the testimony of live witnesses,' " even in the absence of a defense challenge to particular aspects of the prosecution's case' " (*People v. D'Arcy, supra,* 48 Cal.4th at p. 299). As we have explained, "[p]hotographs and other graphic evidence are not rendered 'irrelevant or inadmissible simply because they duplicate testimony[ or] depict uncontested facts . . . .' " (*People v. Thomas, supra,* 53 Cal.4th at p. 806.) Furthermore, most of the photographs illustrated circumstances of the crime that were not conveyed by the mannequin and an external view of the patrol car: incapacitating injury to Deputy Riches's hand, damage to nearby businesses, the position of the patrol car at the scene, items as they were found in the driver's seat area, and closeup details of damage viewed from the interior of the vehicle.

Steskal points to empirical studies regarding the dramatic effect gruesome photographs may have on jury decisionmaking and contends the photographs admitted in his trial were likely to have had an improper impact on the penalty verdict. "Defendant did not raise that objection at trial, and the studies in question are not part of the trial record. Thus, the trial court was not provided an opportunity to consider the relevance of the studies in weighing the potential for undue prejudice against the probative value of the photographs." (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 472.)

We have viewed the photographs and conclude the trial court did not abuse its discretion in admitting them. " ' "A trial court's decision to admit photographs under Evidence Code

section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value." ' " (*People v. Henriquez, supra,* 4 Cal.5th at p. 40.) The autopsy photographs were "tightly cropped" to show only Deputy Riches's hand and arm and photographs of the patrol car were "neither gory nor particularly disturbing." (*People v. Jackson* (2014) 58 Cal.4th 724, 757.) The evidence was " 'neither unduly gruesome nor inflammatory' " (*ibid.*), would not have interfered with the jury's rational decisionmaking, and did not represent an abuse of discretion or a violation of Steskal's constitutional rights.

### 4. Admission of victim impact testimony

Steskal claims that victim impact testimony rendered his penalty retrial fundamentally unfair because it was more extensive and emotional than the federal Constitution allows. We reject this claim.

### a. Background

As previously indicated, Deputy Riches's parents, best friend, and three coworkers testified for part of an afternoon. Their testimony spans 45 pages of transcript.

Deputy Riches's father, Bruce Riches, testified only briefly to describe his depression following the murder and visits to his son's gravesite. He identified a photograph of Deputy Riches taken a few years before his death.

Deputy Riches's mother, Meriel Riches, testified about brain trauma at birth that caused Deputy Riches to have a learning disability and problems with coordination. He succeeded in school through "sheer determination." He also loved participating in the marching band, although he almost quit out of concern his disability would hold the group back.

Even as a teenager, Deputy Riches helped others — building a chicken coop for one elderly couple and a mountainside stairway for another. She testified that he was "brimming over with love and generosity."

James Henery, a captain with the Santa Ana Fire Department, testified that Deputy Riches had been his best friend since high school. Recalling times when they were volunteer firefighters together, Henery described arriving at the scene of a man's death and Deputy Riches's compassion in comforting the man's wife. When they worked together at a home for the disabled, Deputy Riches learned sign language so that he could speak to a resident who was deaf. Deputy Riches was close to Henery's children and wanted a family of his own. He was a loyal friend who would listen to Henery's problems without judgment and someone who was always willing to help others. Henery identified photographs of Deputy Riches as a teenager, of a trip they took together two years before his death, and of Deputy Riches in uniform when he was staffing a booth at the county fair.

Scott Vanover, an OCSD deputy, testified about the strong friendship he developed with Deputy Riches even though they worked together for less than a year. Vanover's brother died during their childhood and the impact of Deputy Riches's death was similar to the experience of losing his brother. Vanover described a trip to London with Deputy Riches, and Deputy Riches's willingness to talk to strangers — Riches was positive almost to the point of being naïve. Vanover identified a photograph of Deputy Riches on their London trip.

Eric Hendry was an OCSD deputy and Deputy Riches's training officer. He described the bond of training officer to

trainee — "almost like brothers" — and the profound effect of Deputy Riches's murder on his marriage, relationship with his children, attitude about his job, and connection to God.

Joseph Hoskins met Deputy Riches when they were both new OCSD deputies working in the jail. He described providing aid to an inmate who was having a seizure and Deputy Riches's encouragement and support through the experience. He testified that Deputy Riches was a "comforting force" and someone on whom he could rely.

### b. *Discussion*

Steskal argues that "highly emotional" testimony from these six witnesses violated his constitutional rights.

"Unless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim and the community is relevant and admissible under [Penal Code] section 190.3, factor (a) as a circumstance of the crime. [Citation.] The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair." (*People v. Brady* (2010) 50 Cal.4th 547, 574.) We have repeatedly held that " '[a]dmission of testimony presented by a few close friends or relatives of each victim, as well as images of the victim while he or she was alive,' " is constitutionally permissible. (*People v. Murtishaw* (2011) 51 Cal.4th 574, 595.)

In *Brady*, for example, where the victim was also a law enforcement officer, we upheld testimony by a physician, three law enforcement officers, and five family members who discussed the victim's "childhood hardships, his lifelong desire to be a police officer, his achievements, his engagement and future plans, his death, his funeral service, and the aftereffects

of his death." (*People v. Brady*, *supra*, 50 Cal.4th at p. 573; see also *People v. Spencer*, *supra*, 5 Cal.5th at p. 678 [seven witnesses for one victim]; *People v. Simon*, *supra*, 1 Cal.5th at p. 140 [six witnesses and 59 pages of testimony].) We decline Steskal's invitation to overrule this precedent, which dictates our conclusion that the nature and amount of victim impact evidence in Steskal's penalty retrial was constitutionally acceptable.

Steskal does not point to specific testimony or evidence when he claims that witnesses conveyed information in a "highly emotional manner" that was particularly inflammatory when considered in the context of other evidence, such as the mannequin and patrol car. "The question is not simply whether victim impact evidence was emotional or demonstrated the devastating effect of the crime; rather, it is whether the testimony invited an irrational response from the jury." (*People v. Simon*, *supra*, 1 Cal.5th at p. 140.) Here, Steskal "provides no persuasive basis for us to conclude that the testimony presented in this case triggered such a response. And our review of the record indicates the testimony was not so emotional that the trial court's failure to exclude it amounted to an abuse of discretion or rendered [defendant's] trial fundamentally unfair." (*Ibid*.)

Finally, Steskal argues that testimony by nonfamily members should have been excluded. This is an argument we have previously rejected. "Neither the United States Supreme Court nor this court has ever identified a constitutional or statutory basis for so constraining the permissible scope of victim impact testimony (see *Payne v. Tennessee* [(1991)] 501 U.S. [808,] 822–823 [prosecution may be permitted to show the loss to the community as a whole]; *id*. at p. 830 (conc. opn. of

O'Connor, J.) [same]; *People v. Pearson*, *supra*, 56 Cal.4th at pp. 466–467; *People v. Thomas* (2011) 51 Cal.4th 449, 507–508 [121 Cal.Rptr.3d 521, 247 P.3d 886]; *People v. Ervine* (2009) 47 Cal.4th 745, 792–793 [102 Cal.Rptr.3d 786, 220 P.3d 820]), and because [defendant] offers no persuasive reasons that would render these authorities inapposite, we again decline to do so here." (*People v. Trinh* (2014) 59 Cal.4th 216, 246.)

### 5. Admission of evidence and instruction on the attempted jail escape

Steskal claims the trial court erred when it admitted evidence of his attempted escape from jail and instructed the jury to consider this incident as aggravating. We conclude no error occurred.

### a. Background

While Steskal was in jail awaiting the penalty retrial, correctional staff discovered a small portion of his cell wall scraped away, found strips of bed sheet hidden in his mattress, and confiscated portions of metal blades and clippers in his possession, some fashioned into hand-held instruments. The defense conceded that the question of whether the metal instruments were weapons or scraping tools was one for the jury but argued there was insufficient evidence of a threat of force or violence to support admission of the escape attempt. The trial court found evidence of multiple crimes admissible pursuant to Penal Code section 190.3, factor (b): attempted escape (Pen. Code, §§ 4532, subd. (b), 664); possession of sharp instruments (*id.*, § 4502); and possession of at least two deadly weapons (*id.*, § 4574).

During the penalty retrial, the prosecution presented evidence that Steskal possessed contraband metal items in jail:

a hair clipper blade attached to a paper handle; portions of nail clippers; and a "shank," a handheld weapon made with metal from a large toenail clipper. A correctional expert testified that the shank and hair clipper blade could be used to stab and slash and were potentially dangerous weapons.

The prosecution also presented evidence that Steskal had been chipping at the wall between his cell and an adjoining mechanical room that contained a ventilator shaft. He had managed to scrape away a patch in the 24-inch-thick concrete wall that was a third of an inch deep. While the mechanical room was locked from the outside, there was no barrier to exiting it once inside; a person could also move through the ventilation system to the roof of the jail, though access to the roof was blocked by metal bars. The strips of bed sheets Steskal saved were long enough to enable his descent from the roof of the jail to the street. Because the jail was in a building that also housed the city police department, correctional and other law enforcement personnel were often present on the street on their way to and from work.

### b. Discussion

"Evidence of actual or threatened violent criminal activity 'that would allow a rational trier of fact to find the existence of such activity beyond a reasonable doubt' is admissible under [Penal Code section 190.3,] factor (b). [Citation.] Such evidence must involve actual, attempted, or threatened force or violence against a person, and not merely to property." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1079.) Factor (b) encompasses "attempted use of force or violence or the express or implied threat to use force or violence." (Pen. Code, § 190.3, factor (b).) "A trial court's decision to admit, at the penalty phase, evidence

49

of a defendant's prior criminal activity is reviewed under the abuse of discretion standard." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1127.)

When considering evidence of escape in the context of Penal Code section 190.3, factor (b), "we must review the factual setting of each particular escape to determine whether it involved actual or threatened violence and not presume that the escape was violent because of the *possibility* of violence in reapprehension." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1257, fn. 2; see *People v. Boyd* (1985) 38 Cal.3d 762, 776–777.) Thus, "[a]lthough evidence of attempted escape alone is not admissible under section 190.3, factor (b)," we have found escape evidence sufficient in a variety of circumstances indicating a threat of violence:  when the defendant possessed a weapon and had a plan to use it (*People v. Romero and Self* (2015) 62 Cal.4th 1, 49); when the defendant attempted to obtain a shank as " 'a ticket out' " and possessed torn mattress covers (*People v. Gallego* (1990) 52 Cal.3d 115, 155; see *id.* at p. 196); when the defendant planned to use a weapon if necessary but had not yet obtained one (*People v. Boyde* (1988) 46 Cal.3d 212, 250); and when the defendant did not possess a weapon, but the escape plan would have required him to confront a guard (*People v. Mason* (1991) 52 Cal.3d 909, 955–956).  In contrast, we have concluded that evidence of escape was not admissible when there was "no evidence that violence was being planned or even prepared for." (*Jackson*, at p. 1256.)

Steskal argues on appeal, as he did at trial, that there was insufficient evidence his attempted escape involved a threat of force or violence.  He claims the contraband metal clippers were for digging out of his cell and no evidence established his intent to use them as weapons.  Our cases establish, however, that

"possession of a potentially dangerous weapon in custody 'is unlawful and involves an implied threat of violence even where there is no evidence defendant used or displayed it in a provocative or threatening manner.'" (*People v. Delgado* (2017) 2 Cal.5th 544, 586.) "'The trier of fact is free to consider any "innocent explanation" for defendant's possession of the item, but such inferences do not render the evidence inadmissible per se.'" (*People v. Jurado* (2006) 38 Cal.4th 72, 139–140.)

The jury could infer from evidence presented that Steskal planned to escape by scraping a hole in his cell wall and exiting the jail with the aid of a rope made of bedsheets. Testimony that a shank and other metal items in his possession could be used as dangerous weapons supported an implied threat of violence. The trial court's decision that this was sufficient evidence of attempted escape for admission pursuant to Penal Code section 190.3, factor (b) was not an abuse of discretion. (*People v. Gallego*, *supra*, 52 Cal.3d at p. 196.)

Even if evidence of the attempted escape fell short of that sufficient to establish threatened violent criminal activity beyond a reasonable doubt, its admission was harmless. Steskal does not challenge the trial court's conclusion that his possession of multiple sharp instruments (Pen. Code, § 4502) and deadly weapons (*id.*, § 4574) was admissible under Penal Code section 190.3, factor (b). (*People v. Landry* (2016) 2 Cal.5th 52, 118; *People v. Wallace*, *supra*, 44 Cal.4th at p. 1082.) Addressing the issue in closing argument, the prosecution highlighted Steskal's manufacture of weapons and argued that he would pose a danger to correctional staff in any setting; this argument did not depend on the conclusion that Steskal specifically intended to use the weapons to commit violence in an escape. And Steskal himself relied on evidence of the escape

to counter the suggestion he was dangerous, arguing that he did not intend to use the contraband clippers and blades as weapons but as tools to scrape the wall. Under these circumstances, we conclude that excluding evidence of Steskal's escape efforts — scraping away a small patch of cell wall and concealing strips of bedsheets — would not have affected the jury's verdict.

Steskal contends the trial court's error in admitting Penal Code section 190.3, factor (b) evidence was exacerbated by instructing the jury to consider it. Finding no error in the admission of the evidence, we reject this claim.

### 6. *Instructional error regarding unadjudicated offenses*

Steskal contends that a pattern instruction regarding Penal Code section 190.3, factor (b) evidence, CALJIC No. 8.87, improperly removed from the jury the task of determining whether alleged criminal activities involved an actual or implied threat of violence. He asserts the instruction also improperly defined the requisite criminal acts as requiring the "implied use" rather than "implied threat" of force or violence, and explains that a threat involves an intention to use force or violence but does not necessarily lead to violence. As we have observed, "these claims are common objections, previously rejected." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 451.)

First, the question whether there was an actual or implied threat of violence was not for the jury to decide. "Although the question of whether the acts *occurred* is a factual matter for the jury, the characterization of those acts as involving an express or implied use of force or violence, or the threat thereof, is a legal matter for the court to decide." (*People v. Manibusan* (2013) 58

Cal.4th 40, 96.)

Steskal's second assertion regarding improperly defined terms is "neither the only nor most reasonable understanding of the instruction." (*People v. Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 452.) "[E]ven if the instruction did not clearly define the types of possible threats, it did not explicitly tell the jury that a threat to use force or violence necessarily was an actual threat, rather than an implied one. Defendant[] w[as] not precluded from arguing that [his] offenses involved only implied threats and that the jury should give less aggravating weight to that evidence." (*Ibid.*)

### 7. *Constitutionality of the death penalty for mentally ill defendants*

Steskal claims the Eighth Amendment to the United States Constitution categorically prohibits the death penalty for individuals with severe mental illness. He further contends that, given his delusional disorder, a death sentence is constitutionally disproportionate to his personal culpability. We have rejected similar claims on several occasions. (E.g., *People v. Ghobrial, supra,* 5 Cal.5th at pp. 275–276; *People v. Mendoza* (2016) 62 Cal.4th 856, 908–909.) Consistent with our precedent, we reject Steskal's claim as well.

The Eighth Amendment prohibition against cruel and unusual punishments is interpreted by referring to " 'evolving standards of decency . . .' to determine which punishments are so disproportionate as to be cruel and unusual." (*Roper v. Simmons* (2005) 543 U.S. 551, 561 (*Roper*).) This inquiry begins with "a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question." (*Id.* at p. 564; see *Atkins v. Virginia* (2002) 536

U.S. 304, 312 (*Atkins*).) We have observed that "while *Atkins* and *Roper* had relied on the emergence of a national consensus against the imposition of the death penalty in cases of intellectual disability[2] and in cases involving juvenile offenders, there exists no similar evidence that a national consensus has formed against the imposition of the death penalty against the class of persons with mental illness." (*People v. Ghobrial*, *supra*, 5 Cal.5th at p. 275; see also *People v. Mendoza, supra*, 62 Cal.4th at p. 909; *People v. Boyce* (2014) 59 Cal.4th 672, 722.)

Steskal asks us to reexamine this conclusion, contending that a national consensus is evident in a type of insanity defense — "volitional incapacity" — available in seven states that impose the death penalty and in decisions from states that have prohibited capital punishment for particular mentally ill offenders through individual proportionality review. The insanity defense Steskal cites, however, is a traditional defense to criminal liability that "surfaced over two centuries ago" (*Clark v. Arizona* (2006) 548 U.S. 735, 749) and is unrelated to sentencing. Furthermore, the most recent of the state laws reflecting the defense have been in place for decades. Similarly, of the handful of individual proportionality cases Steskal cites, only one was decided in this century. Neither these historical decisions nor the existence of an age-old insanity defense reflects a "trend toward abolition" of the death penalty for persons with mental illness. (*Roper*, *supra*, 543 U.S. at p. 566.)

Steskal and his amici curiae claim that additional sources reflect community and international consensus in support of his

---

[2] We use the term "intellectual disability" in accordance with current terminology except when quoting from other sources. (*People v. Woodruff* (2018) 5 Cal.5th 697, 737, fn. 5.)

claim, including opinion polls, positions taken by mental health organizations and the American Bar Association (ABA), and United Nations resolutions. (See, e.g., ABA Section on Individual Rights and Responsibilities, Report of the Task Force on Mental Disability and the Death Penalty (2005) (ABA Task Force Report) <https://www.apa.org/pubs/info/reports/mental-disability-and-death-penalty.pdf> [as of Apr. 29, 2021].) (All Internet citations in this opinion are archived by year, docket number, and case name at <https://www.courts.ca.gov/38324.htm>.) These materials are, however, identical or substantially similar to materials we have already held "insufficient to demonstrate emerging standards that warrant reexamination of our precedent." (*People v. Ghobrial*, *supra*, 5 Cal.5th at p. 276, citing *People v. Mendoza*, *supra*, 62 Cal.4th at p. 910.)

As evidence of a national consensus, Steskal also highlights legislation recently enacted in Ohio that allows defendants to establish ineligibility for the death penalty if they have been diagnosed with one of four serious mental illnesses, including delusional disorder. But while our Legislature may consider following Ohio's lead in approaching this issue (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1252; *People v. Mendoza*, *supra*, 62 Cal.4th at p. 909), the recent Ohio legislation is not, at this point, sufficient to establish a national consensus for purposes of the Eighth Amendment analysis. (Compare *Atkins*, *supra*, 536 U.S. at p. 314.)

In rejecting claims similar to Steskal's, our cases have emphasized the inherent difficulty of defining mental illness for categorical Eighth Amendment exemption and explained that the Legislature is in the best position to address the issue if it so chooses: " 'There are a number of different conditions

recognized as mental illnesses, and the degree and manner of impairment in a particular individual is often the subject of expert dispute. Thus, while it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment, there is likely little consensus on which individuals fall within that category or precisely where the line of impairment should be drawn. . . . We leave it to the Legislature, if it chooses, to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty.' " (*People v. Mendoza*, *supra*, 62 Cal.4th at p. 909.)

Steskal acknowledges this definitional difficulty but argues it does not defeat his claim. Referencing recommendations from the ABA Task Force Report, Steskal proposes a definition of severe mental illness that includes schizophrenia and other psychotic disorders, which, in their acute state, are associated with significant disruptions in thinking and perception. Because the effects of such conditions may not be constant, however — for example, persons with a delusional disorder may not experience such disruptions all or most of the time — Steskal adds the consideration of case-specific factors to his definition of severe mental illness, explaining that it is intended to signify a "class of offenders who are not just severely mentally ill, but whose severe mental illness was causally related to the offense itself."

By these descriptions it is apparent that Steskal's is not a categorical approach to defining a class of offenders with mental illness; instead, it raises the question whether "the penalty was unwarranted under the facts of [a] particular case," an inquiry into individual culpability that must be conducted on a case-by-

case basis. (*People v. Mendoza*, *supra*, 62 Cal.4th at p. 911.) The ABA Task Force Report on which Steskal relies confirms the point, explaining that although *Atkins* "dispensed with a case-by-case assessment of responsibility" for a class defined by intellectual disability, in matters involving severely mentally ill offenders "preclusion of a death sentence based on diagnosis alone would not be sensible, because the symptoms of these disorders are much more variable than those associated with retardation . . . ." (ABA Task Force Rep., *supra*, at p. 4; see also Slobogin, *What Atkins Could Mean for People with Mental Illness* (2003) 33 N.M. L.Rev. 293, 309 [defendants should demonstrate their symptoms during the relevant time period to account for variability associated with mental illness].) These observations are consistent with our prior conclusion that there is " 'likely little consensus' " on " 'where the line of impairment should be drawn' " as a categorical matter or " 'which individuals fall within that category.' " (*Mendoza*, at p. 909.)

Steskal argues that offenders with severe mental illness are in pertinent respects similarly situated to intellectually disabled and juvenile offenders, and therefore should also be categorically exempt from capital punishment. He notes that in reaching its holding in *Atkins*, the high court explained that recognized justifications for the death penalty — retribution and deterrence — did not apply to intellectually disabled offenders, whose impairments render them both less morally culpable and "make it less likely that they can . . . control their conduct based upon" a threat of execution. (*Atkins*, *supra*, 536 U.S. at p. 320.) In *Roper,* the high court reached similar conclusions with respect to offenders under the age of 18. (*Roper*, *supra*, 543 U.S. at p. 571.) Steskal argues that capital punishment similarly fails to serve as a deterrent or proper retribution for those with

severe mental illness.  He also argues that, as with intellectually disabled and juvenile offenders, individuals with severe mental illness may have impairments that hinder their relationship with counsel, limit their ability to competently navigate other aspects of the criminal justice system, and enhance the likelihood a jury would attribute future dangerousness to them. (See *Atkins*, at p. 320.)  Again, precedent forecloses Steskal's arguments.  We have previously explained that the application of the death penalty to individuals with mental illness presents different considerations than its application to intellectually disabled and juvenile offenders.  As Steskal and amici curiae acknowledge, mental illness affects different individuals differently, may wax and wane in severity over time, and even those with severe mental illness may have periods of functioning adequately.  Although some mentally ill offenders may "lack the extreme culpability associated with capital punishment" (*People v. Mendoza, supra*, 62 Cal.4th at p. 909), Steskal has not demonstrated that such impairment "is so widespread among all types of serious mental illnesses that all those so diagnosed must be spared the death penalty" (*id.* at p. 911) because the penalty "would not serve societal goals of retribution and deterrence" (*id.* at p. 909).

As for Steskal's argument regarding reduced capacity to assist counsel, "to the extent that *Atkins* and *Roper* were concerned with the risk of 'unjustified or mistaken execution' in the case of persons with intellectual disabilities and juvenile offenders, significant variations in the forms and nature of mental illness make it difficult to say that impaired competence is a feature common to the class." (*People v. Ghobrial, supra*, 5 Cal.5th at p. 275.)  That is to say, we are unable to attribute to all severely mentally ill defendants a degree of impairment that

necessarily threatens the exercise of rights or undermines the ability to present a compelling case in mitigation, though of course "[a]ll defendants, including this one, have the opportunity to establish that they are not competent to stand trial." (*People v. Mendoza, supra*, 62 Cal.4th at p. 911.) Nor does the risk that mental illness may be wrongfully associated with future dangerousness in some cases establish a categorical basis for excluding all those who experience such a condition from capital punishment — though we emphasize that in every case a defendant is entitled to the benefit of established limits on arguments and evidence concerning future dangerousness. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1185–1186.)

These acknowledged differences between the groups of offenders answer Steskal's argument that it violates equal protection to treat individuals with mental illness differently from intellectually disabled and juvenile offenders: Given the variation among offenders affected by mental illness, we have held that the class of persons with mental illness are not similarly situated to those who are minors or intellectually disabled for purposes of equal protection. (*People v. Mendoza, supra*, 62 Cal.4th at p. 912; *People v. Boyce, supra*, 59 Cal.4th at p. 723.) These conclusions do not prevent an individual from arguing that "the penalty was unwarranted under the facts of [a] particular case . . . ." (*Mendoza*, at p. 911.) But they do foreclose the categorical approach Steskal urges us to adopt.

In the alternative, Steskal requests intracase proportionality review, contending that his death sentence is disproportionate to his individual culpability. The Eighth Amendment to the federal Constitution prohibits the imposition of a penalty that is disproportionate to the defendant's "personal responsibility and moral guilt." (*Enmund v. Florida* (1982) 458

U.S. 782, 801.) California's Constitution establishes the same prohibition. (Cal. Const., art. I, § 17.) Thus, to determine whether a sentence is cruel or unusual, we examine the circumstances of the offense and consider the defendant's personal characteristics, including age, prior criminality, and mental capabilities. (*People v. Mendoza*, *supra*, 62 Cal.4th at p. 911; see also *People v. Landry*, *supra*, 2 Cal.5th at p. 125 [intracase proportionality review conducted upon request].) A sentence is unconstitutional when the penalty is "grossly disproportionate to the offense" (*People v. Dillon* (1983) 34 Cal.3d 441, 450) so that it " 'shocks the conscience and offends fundamental notions of human dignity' " (*People v. Frierson* (1979) 25 Cal.3d 142, 183; see *Mendoza*, at pp. 911–912).

Evidence at trial indicated that Steskal was extremely agitated after leaving his remote camp and returning to town for legal matters related to a prior traffic stop. Shortly before the crime, he could be heard loudly slamming objects and repeatedly yelling that he hated the world. When he went to a 7-Eleven for cigarettes, Steskal carried a semiautomatic rifle he claimed was for protection against the "fucking law." As Deputy Riches arrived at the store, Steskal fired 30 rounds directly at him from close range, with no provocation, and before Deputy Riches could exit his patrol car or draw his gun. The prosecution presented additional evidence that Steskal threatened a police officer many years earlier by racing toward him on a motorcycle. Before his penalty retrial, correctional staff found Steskal preparing for an escape and accumulating contraband metal blades and clippers to chip away at his wall and/or use as weapons.

In his defense, Steskal presented considerable lay and expert testimony regarding his difficult childhood and long-

standing mental health problems. As an adult, he was isolated, tormented by irrational and severe paranoia, and frequently suicidal. There was evidence that following a traffic stop in which he was mistreated by sheriff's deputies, Steskal's mental health deteriorated significantly — at the time of the crime, he held the delusional belief that law enforcement officers wanted to kill him. Despite this evidence, the jury rejected defense arguments for lesser culpability. The jury reached its penalty verdict after considering evidence of Steskal's childhood abuse and family dysfunction, chronic mental illness, persistent developmental problems, lack of a criminal record, and kindness toward others.

Much as in prior cases, we cannot say that evidence of Steskal's mental illness or other characteristics renders his capital sentence grossly disproportionate to his crime. (See *People v. Mendoza, supra*, 62 Cal.4th at p. 911; *People v. Boyce, supra*, 59 Cal.4th at p. 721 [citing cases]; *People v. Lawley* (2002) 27 Cal.4th 102, 171.) Having given careful consideration to this evidence, the jury determined both that Steskal's murder of Deputy Riches was premeditated and deliberate and that death was the appropriate penalty. Given the circumstances of the murder and "in light of the careful consideration already accorded to defendant's evidence of mental illness at the trial level" (*Mendoza*, at p. 912), we cannot say the penalty is unconstitutionally disproportionate.

### 8. *Constitutionality of the death penalty statute*

Steskal presents a number of challenges to California's death sentencing scheme, acknowledging that we have previously rejected them. We decline to revisit our precedent and hold as follows:

There is no merit to Steskal's claim that the special circumstances set forth in Penal Code section 190.2 fail to perform their constitutionally required narrowing function, or that Penal Code section 190.3, factor (a), which allows the jury to consider the "circumstances of the crime" when making a penalty determination, results in the arbitrary and capricious imposition of the death penalty. (*People v. Ghobrial*, *supra*, 5 Cal.5th at p. 291; *People v. Linton* (2013) 56 Cal.4th 1146, 1214–1215.)

We also reject Steskal's claims that additional procedural safeguards are required to ensure constitutionally reliable sentencing. "[T]his court has repeatedly rejected arguments that the federal Constitution requires the penalty phase jury to make unanimous written findings beyond a reasonable doubt that the aggravating factors exist, that they outweigh the factors in mitigation, and that death is the appropriate penalty." (*People v. Brooks* (2017) 3 Cal.5th 1, 115; see *People v. Johnson* (2016) 62 Cal.4th 600, 655–656.) "The United States Supreme Court's decisions interpreting the Sixth Amendment's jury trial guarantee [citations] do not call into question these conclusions." (*Johnson*, at p. 655.) There is likewise no violation of due process or Sixth Amendment jury trial rights in allowing the jury to consider prior unadjudicated crimes aggravating under Penal Code section 190.3, factor (b), and to do so without unanimously finding Steskal guilty of those crimes. (*Johnson*, at p. 656.) Finally, "there is no Eighth Amendment requirement that California's death penalty scheme provide for intercase proportionality review" (*Johnson*, at p. 656) and "the failure to afford capital defendants at the penalty phase some of the procedural safeguards guaranteed to noncapital defendants . . . does not violate the equal protection clause" (*id*. at p. 657).

Contrary to Steskal's claim, " 'the statutory instruction to the jury to consider "whether or not" certain mitigating factors were present [does] not unconstitutionally suggest that the absence of such factors amounted to aggravation.' " (*People v. Jones* (2012) 54 Cal.4th 1, 87.)

Steskal contends evolving standards of decency have rendered the death penalty unconstitutional. He claims the increasing number of states that have abolished the death penalty and its declining use in states that retain it reflect a national consensus against capital punishment. Steskal asserts that additional factors — the rising number of exonerations, race and gender disparities, and delay — further justify a conclusion that the death penalty is unreliable, arbitrary, and cruel and unusual in violation of Eighth Amendment protections.

We are not prepared to say that the trends Steskal cites reflect rejection of the death penalty "in the majority of States" (*Roper*, *supra*, 543 U.S. at p. 567), or that the record before us establishes arbitrariness violative of the Eighth Amendment (see *People v. Seumanu*, *supra*, 61 Cal.4th at p. 1374). We thus decline to revisit the conclusion we have repeatedly reached, that "California's use of the death penalty does not violate international law, the federal Constitution, or the Eighth Amendment's prohibition against cruel and unusual punishment in light of 'evolving standards of decency.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 590.)

## III.   DISPOSITION

The judgment of the superior court is affirmed.

**KRUGER, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in the Supreme Court.*

**Name of Opinion**  People v. Steskal

---

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S122611
**Date Filed:** April 29, 2021

---

**Court:**  Superior
**County:**  Orange
**Judge:**  Frank F. Fasel

---

**Counsel:**

Gilbert Gaynor, under appointment by the Supreme Court, for Defendant and Appellant.

Crowell & Moring, Michelle Gillette, Mina Nasseri-Asghar, Nicole Ambrosetti and Tiffanie McDowell for Mental Health America and National Alliance on Mental Illness as Amici Curiae on behalf of Defendant and Appellant.

Kamala Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General,  Julie L. Garland, Assistant Attorney General, Ronald A. Jakob, Holly D. Wilkens, Robin Urbanski, Christine Y. Friedman  and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gilbert Gaynor
Law Office of Gilbert Gaynor
8383 Wilshire Blvd., Suite 510
Beverly Hills, CA 90211
(805) 636-6209

Christine Y. Friedman
Deputy Attorney General
600 W. Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9050