Filed 1/10/23 P. v. Garza CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | E077734 |
| Plaintiff and Respondent, | (Super.Ct.No. INF1601917) |
| v. | PUBLIC—REDACTED VERSION OF OPINION |
| ANTHONY GARZA, | |
| Defendant and Appellant. | Redacts material from sealed record* (Cal. Rules of Court, rules 8.45, 8.46(f)(1) and (f)(2)) |

APPEAL from the Superior Court of Riverside County. Dean Benjamini, Judge. Affirmed in part; reversed in part with directions.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

---

\* This case involves material from a sealed record. In accordance with California Rules of Court, rule 8.46(f)(1) and (f)(2), we have prepared both public (redacted) and confidential, sealed (unredacted) versions of this opinion. We hereby order the unredacted version of this opinion sealed.

1

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Anthony Garza of second degree murder (Pen. Code,[1] § 187, subd. (a)) and found that he discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)). The trial court sentenced him to 15 years to life, plus 25 years for the firearm enhancement, and imposed various fines and fees. On appeal, defendant contends: (1) the court abused its discretion in denying his motion to disqualify a key witness as incompetent; (2) the court abused its discretion in admitting a photograph of the dead victim; and (3) remand for resentencing is required because the court was unaware of its discretion to impose a lesser, uncharged firearm enhancement pursuant to section 12022.53, subdivision (h), and it erred in imposing various fines and fees. We agree the matter must be remanded to allow the trial court to consider whether to impose a lesser, uncharged firearm enhancement; otherwise, we affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

*A. The Prosecution's Case.*

In 2016, C.D.[2] was living with her mother, her 15-year-old son, her two brothers (J.L. & A.L.), and her aunt in Desert Hot Springs. C.D. slept in the garage, which had been converted into a living area. In December, defendant stayed with her for several

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The parties stipulated that C.D. has a developmental disability.

days, and both C.D. and A.L. saw him with a gun. The victim, who was known by the nickname "Grande" or "El Grande," visited C.D. every day while defendant was staying with her; the victim stayed in the garage at least one night. Defendant and the victim smoked methamphetamine and drank alcohol with C.D. and A.L. during this period.

On December 19, 2016, two men came to the house and accused the victim of stealing a car.[3] A.L. asked the victim for the keys, gave them to the men, and they left.

C.D., defendant, and the victim were in the garage. C.D. testified they all fell asleep. At some point, defendant and the victim got into a verbal argument and started fighting with their hands and feet. C.D. saw defendant shoot the victim in his forehead, which pushed him into a chair. However, she also testified that the victim was sitting in the armchair when he was shot. C.D. went into the house to tell her brothers what had happened. She stayed in the house that night while defendant remained in the garage. Defendant later asked A.L. to help him move the victim's body. A.L. did not call the police because he was afraid defendant would shoot him. The two men wrapped the body in blankets and moved it to the alley behind the backyard.

On December 20, 2016, C.D.'s mother and aunt noticed a "dirt road trail . . . like something had been carried heavy through the whole backyard," and followed it; C.D.'s son was with them. They found the victim's body wrapped in the blanket and called the police. C.D.'s son and mother testified that the victim had visited C.D. multiple times prior to his death. Around the same time, defendant was living with C.D.

---

[3] C.D. initially told police officers that one of the two men shot the victim; however, at trial, she stated that she had lied.

A crime scene investigator testified there was a gun and numerous blood stains in the garage. He identified gunshot residue on the victim's body, but none on the hands. He did not find any gunshot residue on the defendant and there were no visible injuries to his face or body. The investigator collected four shell casings from the victim's pocket, along with jeans that were stained with blood.

A deputy coroner testified that she found the drag marks leading from the rear of the residence, across the backyard, to the victim's body. She observed three gunshot wounds to the victim's face, one of which was a contact wound due to the imprint of the muzzle to his skin. She identified People's exhibit No. 76, a photograph of the contact wound that was taken at the scene. She opined that the victim had been dead for approximately 24 hours by the time she examined his body.

A police detective who investigated the scene testified that he found an unwashed, long-sleeve black shirt, with blood stains, in the washing machine. The detective also located a loaded .22-caliber revolver on the bed in between blankets. Another detective found a pair of jeans in the home's hallway bathroom, behind the door. He stated that the jeans were significant because defendant was taken into custody while coming out of that bathroom wearing boxers and a towel. The jeans had blood on the pant leg and a bag of live, .22-caliber ammunition inside a pocket. Detective Castillo, a third detective, stated that defendant had shoes with a similar tread pattern to the impressions left in the sand where the body was found.

4

On December 20, 2016, Detective Castillo interviewed defendant, and a recording of the interview was played to the jury. Defendant stated that he had known C.D. for approximately a week and had been staying with her in the garage for a few days. He denied having any sexual relationship with her, denied any knowledge of a relationship between C.D. and the victim, and stated that the victim had not been in the garage with him. Defendant further denied having a gun, knowing the victim, or getting into an altercation with him. He identified the white shoes in his cell as his, but did not know why impressions from his shoes were found near the victim's body.

Also on December 20, 2016, Detective Castillo and another detective interviewed C.D., who acknowledged that defendant and the victim had been staying with her for a few days, and two men had come to the house looking for the victim, who had stolen their car. C.D.'s brother, A.L., obtained the car keys from the victim, gave them to the men, and they left. C.D. then fell asleep; she woke up to two men (a white guy and a black guy) beating the victim; the black man shot the victim in the face, and they left. She did not know if defendant was awake or not. A day later, defendant and her brother wrapped the victim's body in a sheet and dragged it through the backyard to the point where it was found.

When the detectives pressed C.D. to tell the truth, she identified defendant as the shooter. She explained that she had lied because she did not want to accept that defendant had shot her friend. She stated that after the men recovered the car and left, the three of them (C.D., defendant, and the victim) went to sleep. She woke up, saw the two fighting and, when the victim tried to get up from the sofa, defendant took the gun from

5

his pants and shot the victim. She disclosed that she was drunk, and "half awake and half asleep" when she heard a boom. She was afraid and went inside the house where she smoked "some meth" with her brothers. Defendant stayed in the garage for a little bit and then joined them. He wanted to bury the body in the backyard.

A criminalist confirmed the stains on the pair of jeans recovered from the hall bathroom were blood, and blood was also on the .22-caliber revolver. Another criminalist testified that the victim's DNA was found on the jeans and the revolver. A third criminalist opined that the cartridge casings recovered from the victim's pocket were fired from the .22-caliber revolver found in the bed.

A forensic pathologist testified that the victim had four gunshot wounds on his face, as well as contusions and abrasion that were separate injuries, but the ultimate cause of his death was the multiple gunshot wounds. She stated that the gun had been fired from no more than six inches from the victim's head.

*B. The Defense.*

C.D. admitted that defendant, the victim, and A.L. used methamphetamine around the time of the victim's death. She testified that when the two men who accused the victim of stealing a car showed up, he seemed afraid, and hid in her brother's room. After the men left, the victim kept talking about the two men. According to C.D., when defendant and the victim were fighting, it looked like defendant was defending himself; however, the victim did not have a weapon. She saw defendant pull the gun from the waistband of his jeans and shoot the victim, causing him to fall back into a chair.

6

Portions of C.D.'s testimony at the July 8, 2018 preliminary hearing were read into the record. She stated that defendant hit the victim in the face, pushed him down on the sofa, and then shot him. She observed a "little bit" of the fight, but did not know what caused it. She "kind of saw" the shooting because she was "kind of awake." But she also testified that she was asleep, and that the shot woke her up. She did not recall seeing any fighting over the gun. As far as she "saw, [the victim] did not fight back."

## II. DISCUSSION

### A. C.D.'s Competency to Testify.

Defendant contends the trial court erred in denying his pretrial motion to disqualify C.D. as an incompetent witness. We disagree.

#### 1. Applicable law.

"When a witness's competency to testify . . . is questioned, we start from the general rule that '[e]xcept as otherwise provided by statute, every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter.' [Citation.] A person is completely disqualified from testifying under Evidence Code section 701, subdivision (a) if he or she is '(1) [i]ncapable of expressing himself or herself concerning the matter so as to be understood . . . or [¶] (2) [i]ncapable of understanding the duty of a witness to tell the truth.' 'Capacity to communicate, or to understand the duty of truthful testimony, is a preliminary fact to be determined exclusively by the court, the burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion.'" (*People v. Flinner* (2020) 10 Cal.5th 686, 740.)

## 2. Further relevant background.

Prior to trial, defense counsel challenged C.D.'s competence to testify under Evidence Code section 701. At the hearing on the matter, the trial court acknowledged that it was aware that she was "declared to be incompetent pursuant to [Penal Code] sections 1368 and 1370 and 1370.1 due to developmental disability," and it had dealt with her in other misdemeanor cases over the last seven years. The court had read numerous reports about her competence, including a report that Inland Regional Center[4] relied upon in determining her to be developmentally disabled. The attorney representing C.D. in her civil commitment case appeared at the hearing and asked the trial court to review two additional reports (Aug. 3, 2020 & Mar. 21, 2021) concerning her developmental status/commitment/ability to care for herself. The court agreed to review the reports and provide copies to both parties under a protective order.

Prior to calling C.D. into the courtroom, the court expressed its initial opinion regarding her competence, stating: "Just to be candid, her testimony at the preliminary hearing—although I wasn't present at the preliminary hearing, I read the transcript—was cogent. It was relatively articulate, meaning I've seen many witnesses and heard many witnesses who don't have some of the same developmental disability issues as [C.D.] testify in much more circumspect ways, much more indirect ways. [¶] The questions— or the answers which were given all were almost by and large directly related to the

---

[4] Inland Regional Center is a government-funded benefit corporation that provides services and programs to people with developmental disabilities and their families in San Bernardino and Riverside Counties.

8

questions which were asked. One reading that transcript, in no way—without any knowledge about [her] particular status, I don't think in any way would have any suspicions about competence. Now, that's not determinant of, obviously, there could be things underlying beneath the surface which don't necessarily manifest itself that clearly, but at least it's a starting point. It's not a situation, at least, then—and I don't know what state she is in now—in which one just looks at it and thinks, 'Oh, my God. There's a problem here.' It's not that type of a situation, at least at the time of the testimony, and I don't know what state she's in here. I will say, personally, I have seen her in different states over the years, and sometimes she appeared to be far more, for lack of a better word, 'with it' than other times. So I will say that."

After C.D. was sworn in, the trial court conducted an examination of her competence to testify as a witness and ordered the transcript of the examination sealed.[5] During the examination, C.D. expressed a preference for using a Spanish interpreter when testifying. The court advised the parties that it found her competent to testify as a witness.

---

[5] [REDACTED]

9

*3. Analysis.*

Defendant contends the trial court abused its discretion in refusing to disqualify C.D. as a witness because inconsistencies in her statements demonstrated her inability to perceive and recollect the shooting incident.[6] The People disagree and argue the record shows that she had sufficient ability to perceive and recollect the events surrounding the shooting, and any inconsistencies in her statements raised questions of credibility, not competency. Because "[t]he issue of a witness's competence largely involves an evaluation and weighing of the evidence concerning the issue" (*In re Ana C.* (2012) 204 Cal.App.4th 1317, 1325), we review in detail C.D.'s testimony at the hearing on the motion.

Defendant emphasizes the following: (1) the court had extensive dealings with C.D. prior to trial; (2) her counsel stated that C.D.'s "ability to retain information and to communicate . . . is extremely limited" and various reports contain information that help determine her ability to "differentiate the truth from a lie and also . . . understand the nature of these proceedings;" (3) she was under a civil commitment and was currently incompetent to stand trial in a criminal matter; and (4) her trial testimony was inconsistent, i.e., who was the aggressor in the fight; did the victim fight back; and when was the victim's body buried, and suspect, i.e., she heard one shot, but there were four; she was half awake and half asleep; and she was unable to separate what she told the

---

[6] [REDACTED]

10

police, what she testified to at the preliminary hearing, and the previous week (or earlier in the day) during the trial.[7] Relying on this evidence, defendant argues the trial court abused its discretion in finding C.D. possessed the capacity to *perceive* and *recollect* the shooting of the victim (Evid. Code, § 701, subd. (a)), and then subsequently not excluding her trial testimony (§ 701, subd. (b)). We disagree.

A witness is disqualified if she is unable to express herself concerning the matter so that she is understood or unable to understand the duty to tell the truth. (Evid. Code, § 701, subd. (a).) Defendant does not challenge C.D.'s competence based on either of these qualifications but on her ability to *perceive* and *recollect* the shooting incident. "Even if a witness is not disqualified as incompetent under Evidence Code section 701, subdivision (a), his or her testimony on a *particular matter* (other than expert opinion testimony) is inadmissible 'unless [the witness] has personal knowledge of the matter.' [Citation.] 'In order to have personal knowledge, a witness must have the capacity to perceive and recollect.' [Citation.] 'A witness challenged for lack of personal knowledge *must* nonetheless be allowed to testify *if there is evidence from which a rational trier of fact could find* that the witness accurately perceived and recollected the testimonial events. Once that threshold is passed, it is for the jury to decide whether the witness's perceptions and recollections are credible.'" (*People v. Flinner*, *supra*, 10 Cal.5th at p. 741.)

---

[7] [REDACTED]

11

Although C.D.'s developmental disability may have impacted her ability to recount the details of the shooting, there is substantial evidence from which a rational trier of fact could conclude that she perceived and recollected the events of the night when defendant shot the victim. As the People note, C.D.'s initial report that a "black guy" shot the victim was not the result of poor perception or recollection, but an attempt to protect defendant. However, when pressed to tell the truth, she stated that the two (defendant & the victim) were fighting, identified defendant as the shooter, and maintained this identification throughout the preliminary hearing and the trial. Also, while her account of the shooting varied—defendant was the aggressor, defendant was defending himself, she was half awake and half asleep, the gunshot woke her up and she saw the two fighting—she consistently stated that defendant shot the victim in the head with a gun. Moreover, C.D. admitted that she had been using methamphetamine and drinking alcohol on the day of the shooting. Thus, the jury was aware of her state of mind—under the influence—and the inconsistencies in her account of what happened, both of which raised questions of her credibility.

But "'[t]he fact that a witness has made inconsistent and exaggerated statements does not indicate an inability to perceive [or] recollect . . . .' [Citation.] Nor does a witness's mental defect or insane delusions necessarily reflect that the witness lacks the capacity to perceive or recollect." (*People v. Lewis* (2001) 26 Cal.4th 334, 356.) Despite the inconsistencies in C.D.'s memory, she was able to answer the prosecutor and trial court's questions, she was able to testify coherently about what she, defendant, and the victim were doing in the days surrounding the victim's death, about the fight between

12

defendant and the victim, and about defendant shooting the victim. Thus, while C.D.'s testimony may have contained some "inconsistencies, incoherent responses, and possible . . . confabulations," she "'presented a plausible account'" of her relationship with both men and the circumstances of the shooting. (*Lewis*, at p. 357 [witness's uncertainty about recollection of events goes to the weight of the evidence, not admissibility]; see *People v. Anderson* (2001) 25 Cal.4th 543, 574-575 [trial court properly allowed witness's testimony about murder despite her delusion that her imaginary son was present at the murder].)

In short, the trial court did not err in permitting C.D. to testify or in subsequently failing to strike her testimony.

*B. Admission of the Photograph of the Dead Victim.*

Defendant contends the trial court abused its discretion in admitting exhibit No. 76, a photograph of the victim's head. He argues the photograph had no probative value, and only served to inflame the jury. We disagree.

*1. Further relevant background.*

At a pretrial hearing, the prosecutor sought to admit exhibit No. 76, a crime scene photograph of the victim's head which showed the locations of the bullet wounds. Defense counsel objected under Evidence Code section 352 on the grounds the only purpose for admitting the photograph is to inflame the passions of the jury since the parties had stipulated to the cause of death. In response, the prosecutor explained the location of the shots helps "to explain the defendant's interview if it comes in," will "corroborate [C.D.'s] testimony about the shots to the face if . . . she's allowed to testify," and will "show . . . the

13

location of the shots." She stated the deputy coroner will identify the bullet wounds and circle their locations on the photograph.

The trial court ruled the photograph was admissible. The court found the photograph was relevant to show the locations of the shots to indicate the manner and circumstances of the victim's death.[8] The court concluded the probative value outweighed any prejudice. Recognizing the evidence could be anesthetized with a two-dimensional sketch of a head and a qualified witness to replicate the shots' locations, the trial court decided this would be a "poor substitute" and unnecessary since the photograph was not unduly prejudicial. The court noted that "you can't even tell it's gunshots. It could just be someone who was bludgeoned [or] in an accident. It's not particularly gruesome."

*2. Analysis.*

"Evidence Code section 352 'permits the court to exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice.' [Citation.] 'During the guilt phase, there is a legitimate concern that crime scene [evidence] can produce a visceral response that unfairly tempts jurors to find the defendant guilty of the charged crimes.' [Citations.] However, '[s]o long as the probative value of graphic or disturbing material is not substantially outweighed by its prejudicial effects, a prosecutor is entitled

---

**8** "Whether the shots are directly on the forehead, on the cheek, straight out in front, given the relative body positions, that can be very indicative of the manner and the circumstances under which someone was killed, which someone was shot . . . ."

14

to use such evidence to "present a persuasive and forceful case."'" (*People v. Steskal* (2021) 11 Cal.5th 332, 355-356 (*Steskal*), citing *People v. Fayed* (2020) 9 Cal.5th 147, 196 [prosecution entitled to present ""grim""" evidence of violent crime], and *People v. Booker* (2011) 51 Cal.4th 141, 171 [prosecution "is not required to sanitize its evidence"].)

Defendant claims the photograph of the victim's head did not have substantial probative value because he never contested the fact the victim had been shot or where he was shot, never disputed the cause of death, and offered to stipulate to the cause of death. According to defendant, the only real issue at trial was whether he acted in self-defense or whether he had acted in imperfect self-defense, reducing the charge to manslaughter, and the photograph offered nothing on this issue. However, defendant did not testify. Thus, the prosecutor had to prove that defendant did not act in self-defense but deliberately murdered the victim by shooting him in the face. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 471 [defense counsel's concession in opening statement that defendant was the shooter did not make autopsy photographs irrelevant or cumulative].) Defendant "'cannot prevent the admission of relevant evidence by claiming not to dispute a fact the prosecution is required to prove beyond a reasonable doubt. The jury was entitled to learn that the physical evidence . . . supports the prosecution's theory of the case.'" (*Steskal*, *supra*, 11 Cal.5th at p. 356.) Since C.D. testified that defendant shot the victim, the photograph of the victim's head was highly relevant to illustrate and corroborate her testimony and support the conclusion that the killing was deliberate. (*Ibid*.) C.D. testified about the positions of defendant and the victim at the time of the shooting. The deputy

15

coroner testified that one of the gunshot wounds was a contact wound due to the imprint of the muzzle to the victim's skin. The photograph corroborated both witnesses' testimony.

Nonetheless, defendant argues that since the trial court commented "you can't even tell it's gunshots. It could just be someone who was bludgeoned [or] in an accident," the photograph served no purpose other than to "appeal to the passions of the jury" and, thus, it was highly prejudicial. Not so. "The prejudice with which Evidence Code section 352 is concerned . . . is not damage to a defense that is caused by relevant, noncumulative, and highly probative evidence. [Citation.] Graphic evidence in a murder case is always disturbing [citation] but it is not inadmissible simply because it is unpleasant to view [citations]. "'The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors.""" (*Steskal*, *supra*, 11 Cal.5th at p. 357.)

Here, defendant does not claim that viewing the photograph exposed the jury to any "sensationalized illustrations of a crime" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1150 [photographs of victim's dismembered body]) or "gratuitous details" unrelated to his actions (*People v. Caro* (2019) 7 Cal.5th 463, 503 [autopsy photos showing the victims' wounds]). Accordingly, "'[w]e will not disturb a trial court's exercise of discretion under Evidence Code section 352 "'*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'"'" (*People v. Mora and Rangel* (2018)

16

5 Cal.5th 442, 480.) We cannot say that the trial court's decision to admit the challenged photograph amounts to an abuse of this discretion.

*C. Remand is Necessary to Allow the Trial Court the Opportunity to Exercise Its Discretion to Impose a Lesser, Uncharged Firearm Enhancement.*

Defendant requested the trial court exercise its discretion to strike his firearm enhancement pursuant to section 12022.53, subdivision (h), and the request was denied. While his request did not include a request to consider the imposition of a lesser, uncharged firearm enhancement (§ 12022.53, subds. (b) or (c)), defendant contends on appeal that the matter must be remanded to allow the trial court to exercise such discretion as explained by the California Supreme Court in *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*). The Attorney General contends defendant is not entitled to remand because he forfeited his claim by failing to raise it below. However, if we find the claim is not forfeited, the Attorney General concedes the matter should be remanded to provide the trial court with an opportunity to exercise its discretion pursuant to section 12022.53, subdivision (h). We conclude the matter should be remanded.

*1. Further background information.*

At sentencing, defense counsel asked the trial court to strike the section 12022.53, subdivision (d) firearm enhancement. Noting its limited sentencing options, it declined to

17

do so on the grounds it would not be in the interests of justice.[9]  Neither the court nor the parties expressed an awareness that the court possessed the discretion to do anything other than impose or strike the firearm enhancement.

  *2. Analysis.*

Section 12022.53 established a three-tiered system of sentencing enhancements for specified felonies involving firearms. (§ 12022.53.)  "'Section 12022.53, subdivision (a) lists the felonies to which the section applies.  Section 12022.53[, subdivision] (b) mandates the imposition of a 10-year enhancement for personal use of a firearm in the commission of one of those felonies; section 12022.53[, subdivision] (c) mandates the imposition of a 20-year enhancement for personal and intentional discharge of a firearm; and section 12022.53[, subdivision] (d) provides for a 25 year-to-life enhancement for personal and intentional discharge of a firearm *causing great bodily injury or death* to a person other than an accomplice.'  [Citation.]  Subdivision (h) of section 12022.53 provides that under section 1385 a court may, 'in the interest of justice,' 'strike or dismiss

---

**9** The trial court stated: "In this particular case, I cannot fathom how it would be in the interest of justice to strike that particular gun allegation.  The killing was done in a cruel manner.  It was done in a vicious manner.  It was done in a senseless manner.  It was done callously.  The treatment of the decedent afterwards was as equally cruel, vicious, and callous, simply dragging someone out and leaving them in the desert, as [the victim's] family so bluntly put it, like an animal.  [¶]  Most people wouldn't even treat their pets that way.  And if their pet died, they would make sure they had a proper burial and not just thrown out and dragged out and left to rot in the desert.  [¶]  [Defendant's] actions demonstrate someone who has absolutely no regard whatsoever for humanity, no regard for anyone else.  And someone who is not meritorious of the Court exercising its discretion under 1385 to strike that allegation.  So, therefore, the request to strike the allegation is denied at this time.  And [defendant] will be sentenced to the additional 25 years to life which is the mandatory term for the 12022.53 allegation for a total term of 40 years to life."

18

an enhancement otherwise required to be imposed by this section.'" (*People v. Fuller* (2022) 83 Cal.App.5th 394, 400, review granted Nov. 22, 2022, S276762.)

At the time of defendant's sentencing, July 16, 2021, the California Supreme Court had not yet issued its decision in *Tirado*, *supra*, 12 Cal.5th 688, which held that subdivision (h) of section 12022.53 authorized a trial court to strike a greater, charged section 12022.53 enhancement and impose a lesser, uncharged section 12022.53 enhancement where the facts supporting that lesser enhancement were alleged in the information and found true by the jury. (*Tirado*, at p. 700.) There is nothing in the record indicating that the trial court anticipated the Supreme Court's holding, or otherwise understood that it had such discretion. Also, neither defense counsel nor the prosecutor raised this issue. The Attorney General contends the issue is forfeited. We disagree.

Generally, "only those claims properly raised and preserved by the parties are reviewable on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) Thus, a party that has not raised an issue at the trial level forfeits it on appeal. (See *People v. Holman* (2013) 214 Cal.App.4th 1438, 1449.) However, forfeiture is not automatic. (*People v. McCullough* (2013) 56 Cal.4th 589, 593.) Rather, "an appellate court may exercise its discretion to review a claim affecting the substantial rights of the defendant despite forfeiture for failure to raise the issue below." (*People v. Denard* (2015) 242 Cal.App.4th 1012, 1020.) Also, a reviewing court is "more inclined to find an exception to the general rule of forfeiture when there has been a change in decisional law that affects the rights of the parties." (*GreenLake Capital*, *LLC v. Bingo Investments*, *LLC* (2010) 185

Cal.App.4th 731, 739, fn. 6.) "'In determining whether the significance of the change in the law excuses counsel's failure to object at trial, we consider the "state of the law as it would have appeared to competent and knowledgeable counsel at time of the trial."'" (*People v. Perez* (2020) 9 Cal.5th 1, 8.)

Here, defendant did not forfeit his right to appeal the sentence imposed under section 12022.53, subdivision (d), despite his failure to ask the trial court to impose a lesser enhancement at sentencing. As we previously noted, at the time the trial court considered whether to strike the firearm enhancement, the question of whether it had the discretion to impose a lesser firearm enhancement was unresolved. Indeed, this very issue prompted the Supreme Court's review in *Tirado*. (See *Tirado*, *supra*, 12 Cal.5th at pp. 696-697.) Although asking the trial court to impose a lesser enhancement at the time of defendant's sentencing was not "wholly unsupported by substantive law," the discretion issue was not well established under California law. (*People v. Welch* (1993) 5 Cal.4th 228, 237 ["failure to timely challenge a probation condition on '*Bushman/Lent*' grounds in the trial court waives the claim on appeal"]; *Tirado*, 12 Cal.5th at pp. 696-697 [appellate courts are split on this question].)[10] Given the split in authority at the time of defendant's sentencing, we are "more inclined to find an exception to the general rule of forfeiture" for his failure to request a lesser enhancement. (*GreenLake Capital*, *LLC v. Bingo Investments*, *LLC*, *supra*, 185 Cal.App.4th at p. 739, fn. 6.) For that reason,

---

[10] Even this appellate court, in 2020, did not agree that the trial court had the discretion under sections 1385 or 12022.53 to impose a lesser enhancement. (See *People v. Yanez* (Jan. 21, 2020, E070556) trans. and opn. ordered vacated Apr. 20, 2022, S260819.)

defendant's failure to ask the trial court to exercise its discretion to impose a lesser enhancement at sentencing falls into the narrow category of exceptions to the forfeiture rule, and he may request a remand for resentencing on appeal.

*Tirado* clearly establishes that a trial court has the discretion to strike a greater, charged section 12022.53 enhancement and impose a lesser, uncharged section 12022.53 enhancement where the facts supporting that lesser enhancement were alleged in the information and found true by the jury. (*Tirado*, *supra*, 12 Cal.5th at p. 700.) Remand for resentencing is therefore appropriate.

*D. Imposition of Restitution and Parole Revocation Fines.*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1168, 1172 (*Dueñas*), defendant contends the trial court violated his due process rights when it imposed a $300 restitution fine under section 1202.4, subdivision (b), and a suspended $300 parole revocation fine under section 1202.45 without a hearing to determine his ability to pay.[11] Alternatively, citing *Timbs v. Indiana* (2019) ___ U.S. ___ [139 S.Ct. 682, 686-689] and *People v. Cowan* (2020) 47 Cal.App.5th 32, 48-49 (*Cowan*), review granted June 17, 2020, S261952, he contends the fines violate prohibitions in the federal and state constitutions against excessive fines. We reject his contentions.

---

[11] Because the parole revocation fine (§ 1202.45, subd. (a)) is essentially a corollary of the restitution fine imposed under section 1202.4, subdivision (b), we will not separately address it. (See § 1202.45, subd. (a).)

*1. Further background information.*

According to the probation report, defendant is 32 years old, has no current physical or mental health problems, and has no wife or children. He completed the ninth grade and intends to get his high school diploma and take college-level courses while incarcerated. Prior to his arrest, he was working for a construction company, laying tile, and earning about $1,500 monthly. The probation officer recommended the trial court impose various fines and assessments, including a $10,000 victim restitution fine (§ 1202.4, subd. (b)) and a suspended parole revocation fine in the same amount (§ 1202.45).

At sentencing, the trial court imposed the statutory minimum restitution fine of $300 (§ 1202.4, subd. (b)),[12] a stayed statutorily required parole revocation fine of $300 (§ 1202.45),[13] and various other fines and assessments. Defense counsel indicated that defendant requested "some sort of fee waiver regarding the restitution amounts," but

---

[12] Section 1202.4, subdivision (b), in relevant part, provides, "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. [¶] (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000). . . ."

[13] Section 1202.45, subdivision (a), provides, "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." The parole revocation fine must be suspended "unless the person's parole, postrelease community supervision, or mandatory supervision is revoked." (§ 1202.45, subd. (c).)

counsel did not request a determination as to defendant's ability to pay the restitution fines.

　　2. *Analysis.*

Where the trial court imposes a restitution fine above the statutory minimum, the court must consider the defendant's ability to pay. (§ 1202.4, subd. (d); see *People v. Ramirez* (2021) 10 Cal.5th 983, 1041 ["in setting the amount of a restitution fine, the trial court . . . must consider a host of factors—including a defendant's ability to pay—if it sets the fine above the minimum"]; see also, *Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) Because the court ordered the statutory minimum fine of $300, defendant was not entitled to a hearing on his ability to pay. Moreover, "the Constitution does not prevent a state from enforcing a money judgment for a *punitive* fine against an indigent defendant." (*People v. Son* (2020) 49 Cal.App.5th 565, 593.) A restitution fine, "being a punishment, can properly be imposed on a defendant who is unable to pay it because . . . there is no fundamental unfairness in facing enforcement of a money judgment for a delinquent debt as a consequence of being unable to satisfy a monetary punishment. . . . [¶] . . . [T]here is no fundamental right not to be burdened by a punitive fine." (*Id*. at p. 596.) Thus, the trial court was not required to hold an ability-to-pay hearing before imposing the section 1202.4, subdivision (b) restitution fine.

More recently, cases have concluded the excessive fines clause of the Eighth Amendment, rather than due process principles, provides the proper analytic framework in this situation. In *Cowan*, the Court of Appeal held that "upon proper objection, a sentencing court must allow a defendant facing imposition of a minimum restitution fine

23

. . . an opportunity to present evidence and argument why [this] financial exaction[] exceed[s] his ability to pay," and that this exaction may be analyzed as a fine under the excessive fines prohibition of the Eighth Amendment. (*Cowan*, *supra*, 47 Cal.App.5th at pp. 34, 42-45; see *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067-1071 [Eighth Amendment, rather than due process, proper basis for challenge to imposition of fines, fees, and assessments].)

To the extent defendant faults the trial court for not making an ability-to-pay determination and argues that *Cowan* entitles him to make a record of his inability to pay under an Eighth Amendment excessive fines analysis, we find this citation unhelpful and his argument incomplete. The *Cowan* court held that "[b]ecause ability to pay is an element of the excessive fines calculus under both the federal and state Constitutions, . . . a sentencing court may not impose . . . restitution fines without giving the defendant, *on request*, an opportunity to present evidence and argument why such monetary exactions exceed his ability to pay." (*Cowan*, *supra*, 47 Cal.App.5th at p. 48, italics added.) Defendant failed to make such a request. Also, his briefing does not suggest he had additional evidence or argument to present on this point—except to note there are more inmates than available paying jobs.[14]

---

[14] In appellant's opening brief, defendant "requests that this Court take judicial notice of the statements found on the [California Department of Corrections and Rehabilitation's (CDCR)] official website." California Rules of Court, rule 8.252, requires a party to serve and file a separate request or motion. Requests for judicial notice should be handled by a motion procedure to ensure adequate notice and opportunity to respond. The request as stated in the opening brief is denied.

"The CDCR can . . . take 55 percent of prison wages [earned] to collect court ordered restitution." (See <https://www.cdcr.ca.gov/victim-services/restitution-responsibilities> [as of Jan. 10, 2023].) "There are . . . more inmates incarcerated than there are paying jobs available." (See <https://www.cdcr.ca.gov/victim-services/restitution-collections> [as of Jan. 10, 2023].) Effective September 23, 2021, "[i]f a prisoner owes a restitution fine imposed pursuant to . . . Section 1202.4 . . . , [CDCR] shall deduct a minimum of 20 percent or the balance owing on the fine amount, whichever is less, up to a maximum of 50 percent from the wages and trust account deposits of a prisoner." (§ 2085.5, subd. (a); Stats 2021, ch. 257, § 37.)

Even if we were to address the merits of whether the minimum statutory amount ($300) of the restitution fine is excessive, defendant's inability to pay does not, by itself, render the amount unconstitutionally excessive because it is not the only factor. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality." (*United States v. Bajakajian* (1998) 524 U.S. 321, 334.) Trial courts consider four factors: (1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) penalties imposed in similar statutes; and (4) a defendant's ability to pay. (*Id.* at pp. 337-338; see *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728, [adopting the same four factors]; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96-97, review granted Nov. 13, 2019, S257844[15] [restitution fine

---

[15] The Supreme Court limited the issues to be briefed and argued in *Kopp* as to (1) whether a trial court must consider a defendant's ability to pay before imposing fines, fees, and assessments, and (2) if so, which party bears the burden of proof of inability to pay. (*People v. Kopp*, review granted Nov. 13, 2019, S257844 [2019 Cal. Lexis 8371].)

under § 1202.4 is properly challenged under excessive fines clause; there is no due process requirement that trial court hold ability-to-pay hearing before imposing a punitive fine].)

Here, defendant makes no effort to show that the other three factors—his culpability, the relationship between the harm and the penalty, and the penalties imposed in similar statutes—militate against the imposition of the minimum statutory amount. (*People v. Kopp*, *supra*, 38 Cal.App.5th at p. 97 [judgment presumed correct; defendant has burden to demonstrate error through meaningful legal analysis].) He has therefore not met his burden to illustrate the statutory minimum violates either the federal or state constitutions' proscriptions against excessive fines.

## III. DISPOSITION

Defendant's sentence is vacated, and this matter is remanded for resentencing. At resentencing, the trial court shall consider all sentencing options under section 12022.53. (*Tirado*, *supra*, 12 Cal.5th at pp. 696, 700.) Following the resentencing hearing, the trial court is to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
                                                                                    J.

We concur:

RAMIREZ_____
                    P. J.

CODRINGTON_____
                    J.

26